## NATIONAL LABOR RELATIONS BOARD v. GATE CITY COTTON MILLS.

### No. 12175.

Circuit Court of Appeals, Fifth Circuit.
April 16, 1948.

Rehearing Denied May 14, 1948.

T. Lowry Whittaker, Chief Law Officer, National Labor Relations Board, of Atlan-

ta, Ga., David P. Findling, Asst. Gen. Counsel, National Labor Relations Board, and Ruth Weyand, Acting Asst. Gen. Counsel, National Labor Relations Board, both of Washington, D.C., for petitioner.

John Wesley Weekes and Murphey Candler, Jr., both of Decatur, Ga., for respondent.

Before HUTCHESON, HOLMES, and McCORD, Circuit Judges.

McCORD, Circuit Judge.

The National Labor Relations Board commenced this proceeding for enforcement of an order issued against respondent, Gate City Cotton Mills, on August 22, 1946, requiring respondent to cease and desist from alleged unfair labor practices; to offer an employee, James Jackson, reinstatement and back pay because of his discriminatory discharge; and to post appropriate notices to all employees that respondent would not further violate their rights under the National Labor Relations Act, 49 Stat. 449, as amended by Labor Management Relations Act, 1947, Public Law 101, 80th Cong., 1st Sess., Ch. 120, 29 U.S.C.A. § 151 et seq.

Respondent contends (1) that the findings of the Board are not supported by substantial evidence; and (2) that its conduct complained of did not, as a matter of law, interfere with, restrain, or coerce any employees in the exercise of their rights conferred by Section 7 of the Act.

In February, 1945, the Textile Workers Union of America, C. I. O., launched an organizational campaign among the respondent's employees at Gate City Cotton Mills, East Point, Georgia. To insure the success of their drive, the union organizers represented to the employees that a strong union at the mill would bring benefits in the form of higher wages and vacations with pay. Upon learning of the union activity within the mill, and of the promises made to the employees by its proponents, respondent also became interested in securing for the employees the very benefits sought by the union. On March 28, 1945, respondent made application to the National War Labor Board for a wage increase for its employees, the same day the union filed its petition for certification as bargaining agent.

A week later, respondent made a second appeal for approval by the War Labor Board of a proposed vacation plan with pay. Both the proposed wage increase and vacation plan were approved by the Labor Board and instituted by respondent during the advent of the union within the mill. On May 16, 1945, respondent's Vice President, Milner, made a speech to the employees and reminded them of the benefits obtained for them by respondent, without the help of the union, and that respondent "did not believe the union could give you anything which you are not already receiving from the Company." An election conducted by the Board the next day resulted in the defeat of the union.

While union organizational activity within the mill was at its height, it was shown that respondent had, through its supervisory workers, secured renunciation of the union by several employees. These employees were offered better housing accommodations as an inducement for their signing a card requesting the union to strike their membership. Fifteen of these withdrawal slips were received at the union headquarters prior to the Board's conducted election in which the union was defeated. There was evidence that respondent's own supervisory employees had induced the individual employees to sign these withdrawal from union membership cards, and had then addressed and mailed them to the union office.

At the Board hearing in the representation proceeding, held on April 21, 1945, respondent became aware of the prominent role played by an employee, James Jackson, in the union's organizational activities. It was shown that prior to this occasion relations between respondent and the employee Jackson were very cordial; that Vice-President Milner had commented on Jackson's record of loyal attendance, and expressed an intention to promote him at an early date. After the hearing, however, respondent's attitude toward this employee was noticeably hostile. Respondent then proceeded, through two foremen charged with supervising Jackson's work, to engage in constant surveillance, harassment, and discrimination against him. Although Jack-

son, while formerly enjoying respondent's confidence and favor, had been permitted a wide latitude and discretion in the performance of his duties, after the hearing it was shown that he was no longer accorded the same privileges. He was not permitted to leave his work at any time, was criticized and warned vehemently of trivial mistakes formerly overlooked, accused of being crooked and disloyal, and subjected to the constant threat of discharge. After a period of six months, Jackson became ill, and upon the suggestion of respondent's doctor and with respondent's permission, left the mill to regain his health. It was shown that after Jackson's departure from the mill on sick leave, certain of respondent's anti-union officials continued their surveillance and harassment of him at home during his convalescence. A few days after leaving work Jackson moved from the home furnished him by respondent to a farm several miles distant. Because of his removal from respondent's property, and because of a suspicion that Jackson was no longer ill, respondent's officials assumed that he had quit his job. When he returned for work about a month later, they denied him reinstatement with the explanation that his job had been filled during his absence.

■ We are of opinion substantial evidence supports the finding of the Board that respondent has engaged in unfair labor practices within the meaning of Section 8 (1) and (3) of the Act. Medo Photo Supply Corp. v. N. L. R. B., 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007; N. L. R. B. v. East Texas Motor Freight Lines, 5 Cir., 140 F.2d 404, 405; Sewell Hats, Inc. v. N. L. R. B., 5 Cir., 143 F.2d 450; N. L. R. B. v. Norfolk Southern Bus Corp., 4 Cir., 159 F.2d 516, 518.

■ ■ We do not consider the employer's conduct here complained of to be protected by Section 8(c) of the Act, as amended. Labor Management Relations Act, 1947, Section 8(c). Moreover, since the findings and order of the Board were also based on substantial evidence of unlawful conduct,

other than mere anti-union statements of the employer, this question becomes immaterial. Employers still may not, under the guise of merely exercising their right of free speech, pursue a course of conduct designed to restrain and coerce their employees in the exercise of rights guaranteed them by the Act. Anti-union conduct of this nature remains violative of the new enactment. N. L. R. B. v. Sandy Hill Iron & Brass Works, 165 F.2d 660; N.L.R.B. v. National Garment Co. & Wells-Wear Company, 166 F.2d 233.

■ The constant surveillance and harassment to which the employee Jackson was subjected, after respondent became aware of his union activities, constitutes a systematic course of discrimination violative of the Act, which entitles him to reinstatement. N. L. R. B. v. Fansteel Metallurgical Corp., 306 U.S. 240, 248, 251, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599; Glatfelter Co. v. N.L.R.B., 3 Cir., 141 F.2d 631, 632, 633; N.L.R.B. v. Sartorius & Co., Inc., 2 Cir., 140 F.2d 203, 205.

■ We do not construe Section 10(b) of the new enactment applicable so as to relieve an employer from liability arising out of any unfair labor practice committed prior to its passage where, as here, the complaint was filed before the new Act was passed. Labor Management Relations Act, 1947, Section 10(b); 16 Stat. 431, 1 U.S.C. A. § 21 et seq; 1 U.S.C.A. § 109; Hertz v. Woodman, 218 U.S. 205, 218, 30 S.Ct. 621, 54 L.Ed. 1001; Maceo v. U.S., 5 Cir., 46 F.2d 788, 789.

The record reveals this case was tried with a fairness and impartiality which bespeaks the eagerness of the Trial Examiner to ascertain the true facts. After three postponements and a full and fair hearing, on motion of respondent, the case was reopened to consider additional evidence. On rehearing, the Trial Examiner adhered to his previous findings.

The record presents no reversible error.

Let the order of the Board be enforced.