**NATIONAL LABOR RELATIONS BOARD**
**v. KROPP FORGE CO.**
No. 9883.

United States Court of Appeals
Seventh Circuit.

Dec. 30, 1949.

Rehearing Denied Jan. 31, 1950.

David P. Findling, A. Norman Somers, Assistant General Counsel, Ruth Weyand, Lawyer, National Labor Relations Board, Washington, D. C., and Arnold Ordman, Washington, D. C., for petitioner.

Louis Linton Dent, Leo T. Norville, Chicago, Ill., John D. Picco, Chicago, Ill., for respondents.

Before KERNER, FINNEGAN and SWAIM, Circuit Judges.

SWAIM, Circuit Judge.

This case is before us on the petition of the National Labor Relations Board, under Section 10(e) of the National Labor Relations Act, 29 U.S.C.A. Supp., §§ 151 et seq., 160(e), for enforcement of its order issued against Kropp Forge Company and Kropp Forge Aviation Co.

Respondents state that "The main question in this case is whether, since the passage of the Taft-Hartley Act, 29 U.S.C.A. 158(c), the Board's decision and order, which were primarily based upon the statements (of officials and representatives of the respondents) and the inference the Board drew therefrom, should be enforced."

The respondents insist that under the new Section 8(c) of the Act, 29 U.S.C.A.

§ 158(c), all of the statements of the representatives of the respondents were merely expressions of opinion and could not be considered as constituting, or being evidence of, unfair labor practice.

The order in question directed the respondents to cease and desist from: Dominating or interfering with the administration of, or contributing support to, the Employees Association of the Kropp Forge Company (hereinafter referred to as "Association"), or any other labor organization of their employees; recognizing the Association, or any successor thereto, as the bargaining representative of any of their employees; giving effect to the contract with the Association, dated February 26, 1945, or to any other contract with said Association; and in any other manner interfering with, restraining or coercing their employees in the exercise of their right to self-organization, to bargain through representatives of their own choosing and to engage in concerted activity for purposes of collective bargaining or other mutual aid or protection as guaranteed in Section 7 of the Act.

The order also required the respondents to: withdraw all recognition from and disestablish the Association or any successor thereto; discontinue the Labor Management Committee as a medium for dealing with their employees with respect to grievances, wages and other conditions of employment; and to post notices of compliance.

This order was based upon a finding by the Board, upon the entire record, that respondents had, and were, engaging in unfair labor practices, within the meaning of Section 8(2) of the Act, in that respondents dominated and interfered with the formation and administration of, and contributed support to, the Association, and that by such acts and the statements and questions of President Roy Kropp, Plant Managers Hellstrom and Sweeney and Superintendent Lane, the respondents interfered with, restrained and coerced their employees in the exercise of the rights guaranteed in Section 7 of the Act, thereby engaging in unfair labor practices under Section 8(1) of the Act.

The substance of the pertinent facts found by the trial examiner and adopted by the Board are as follows:

Prior to 1939, except for a small group of die sinkers and truck drivers, who were represented by affiliated labor organizations of their own choice, the employees of respondents had no collective bargaining representative. In October, 1939, as a result of the activity of William Ohlson, an old employee of the Kropp Forge and an adherent of A.F. of L., union circulars were distributed outside the plant by the International Brotherhood of Blacksmiths, Drop Forgers and Helpers, A.F. of L., and by the International Associations of Machinists, then also affiliated with the A.F. of L. On the day these circulars were being distributed, Hellstrom stated to Ohlson, "Listen, Bill, I don't want no organization in here." Ohlson persisted in his efforts and Hellstrom again told him he didn't want any organization in the plant.

Later Ohlson prepared four round-robin petitions which stated that the signers were in favor of forming a labor organization but did not specify any particular organization. About 90% of the employees signed these petitions which were circulated during working hours. Thereupon Roy Kropp summoned 15 or 20 of the key men of the shop to a conference in the plant offices. The vice-president, secretary and Hellstrom were also present. These officials told the assembled key men that they should try to make any organization which they formed a shop organization and restrict the membership to employees of the plant.

Shortly thereafter Hellstrom offered the employees the use of the plant machine shop for a meeting and election to determine what kind of an organization they should have. On December 30, ·Ohlson posted notices, prepared by one of the office employees, announcing that such a meeting would be held, at noon of that day, in the machine shop. Thereafter, on the same morning, there was posted, on the same bulletin board, a notice over the signature of the president of the Company, that, in celebration of the close of the year, beer and sandwiches would be served in the same machine shop at noon of that day. The same morning President Kropp stopped Ohlson and told him that, "I don't care whether the employees form an independent organization or one affiliated with the A.F. of L., but for the love of Pete, anything but the C.I.O." About one-third of the employees of the plant attended the meeting. Ohlson acted as chairman and Hellstrom, who was present at the outset of the meeting, told the employees they were free to meet in the machine shop and then left.

After a discussion of the relative merits of organizing as an affiliate of the A.F. of L., or the C.I.O., or as an independent union, a majority of the employees present voted for a shop organization. Immediately after the meeting, pursuant to the notice by the president, the Company served free beer and sandwiches. Hellstrom and foremen Carlson and Dahl were present ·for this party and the two foremen congratulated Ohlson on the decision of the employees to have an independent organization.

Early in January, 1940, the formal organization of the Association was completed. Thereafter, in February, the Association submitted a proposed collective bargaining contract to the Company with a letter emphasizing the independent, unaffiliated nature of the Association, claiming a membership of at least 80% of the employees of the plant and requesting that the Association be recognized as the sole collective bargaining representative of the plant employees. President Kropp met with the committee representing the Association, asked proof of the Association's majority status and was given, by Ohlson, the round-robin petitions. Kropp glanced at these and returned them to Ohlson. In spite of the fact that these petitions were executed before the formation of the Association; that they did not specify any particular organization as the bargaining agent, and that no check was made as to the number or validity of the signatures or the petitions, Kropp Forge at once granted the Association exclusive recognition. The Company did not accept the contract submitted by the Association but, instead, sub--

mitted a contract it had caused to be drawn, which the Association accepted.

In June, 1941, the Association was planning a picnic for all of the employees. The respondent, on learning of the plan, volunteered to, and did, pay for the picnic and for similar picnics each year thereafter.

Prior to 1943 memberships and dues for the Association were openly solicited and collected in the plant during working hours. At the beginning of that year the Company inaugurated a check-off system under which it deducted Association dues each month from the wages of each employee named on the membership list supplied by the Association. This was without cost to the Association.

In 1943 a Labor Management Committee was organized by the Company, pursuant to request of the War Production Board, for the purpose of increasing war production. The program called for membership on the Committee to consist of an equal number of employer and employee representatives, the employee representatives to be selected by the recognized union, if there was one. The purpose of the Committee was to consider and improve all aspects of the production process which would tend to increase the quantity and quality of the products manufactured. According to the War Production Board instructions, the Committee was not to interfere with any bargaining machinery or undertake its functions. At the suggestion of O'Keefe, the industrial relations director of the respondents, the executive board of the Association acted as the labor representatives on the Committee. The unions representing the truck drivers and die sinkers were ignored as were the production and maintenance employees who were not members of the Association. This Labor Management Committee, so constituted, handled problems concerning grievances, wage increases, and other matters ordinarily handled for employees by bargaining representatives. The reports of rival union activities in the plant were discussed and considered.

The 1944 agreement, between the respondents and the Association, provided that wages for the term of the contract should be "in accordance with the established policy of the Company and the wage range approved by the War Labor Board." The contract also provided for an incentive bonus conditioned on certain production and payable only to employees who complied with certain standards and rules. Dissatisfaction among the employees, concerning the 1944 contract, caused other labor organizations to actively compete for the employees' favor. At a Labor Management Committee meeting, in May or June, 1944, the problem of procuring larger attendance at Association meetings was raised and discussed. In connection therewith the Association's request, that the shop stewards who worked on Sunday be given time off with pay to attend regular meetings of the Association, was granted, the pay for such time to be at the overtime rate for Sunday work. Meetings of the stewards were often held on plant property during working hours with the permission of the respondents.

While activity of rival unions was in progress during 1944, two conversations between representatives of respondents and employees occurred which were considered by the Board as evidence of unfair labor practices by respondents. The first of these conversations occurred when Plant Manager Sweeney summoned employee Areen to his office and asked him what he knew about the A.F. of L. Areen answered that he didn't care; that he was going to leave Kropp Forge pretty soon and then Sweeney said, "Well, Dave, stick with me. You will go places." The second conversation occurred between employee Clinton and Superintendent Lane. Clinton went to Lane and asked him for a raise. Lane gave him no definite answer about the raise but asked him what he knew about the A.F. of L. Clinton said there was activity within the shop and Lane then said, "We don't want the A.F. of L. in here. They won't do us any good."

During the month of June, 1944, a representative of U.A.W. (C.I.O.) asked respondents for a bargaining conference. A few days later, on June 26, adherents of the Blacksmiths Union (A.F. of L.) made

plans for an organizational meeting of employees to be held on June 29. On June 27 the U.A.W. representative threatened the respondents that "unless a meeting (between respondents and U.A.W.) was arranged immediately, he would shut down the plant." Later that morning there was a work stoppage of one hour in the flat die department of the plant. The president of the Association was thereupon summoned by respondents to explain these matters. He asked permission of the respondents to also hold a special Association meeting on June 29, between three and five in the afternoon to see whether "they couldn't get this thing straightened out." Since the shifts in the plant changed at 4:00 P.M., he also requested that in order to attend the meeting the first shift be allowed to leave work one hour earlier and that the second shift be allowed to report to work an hour late. Pursuant to this arrangement, the meeting was held on June 29, and, on the Plant Manager's instructions, respondents' supervisors told the employees on the first shift that they would be excused an hour earlier for the Association meeting and employees reporting for the second shift were told by Plant Guards of the meeting and that employees attending would be paid for their time. All employees who so took time off to attend the meeting were paid therefor by the respondents. The meeting was the largest in attendance which the Association had ever held. The meeting which the Blacksmiths' union had scheduled for the same hours was held in two sessions, one for each shift, and was attended by only a handful of the employees.

In February, 1945, respondents executed a new one year contract with the Association to be effective March 1. This new contract adopted a new grievance procedure and specifically set forth the role of the Labor Management Committee in the settlement of grievances.

The evidence on some of the above facts was conflicting, but there was some positive testimony supporting all of such facts.

In respondents' brief they describe the issues in this case as being:

"1. Whether this court should enforce the Board's order, which was primarily based on statements of respondent's officers and supervisors, which contained no threat of reprisals or force, or promise of benefit, and which they clearly had a right to make.

"2. Whether this court should hold unlawful, by enforcing the Board's order, the statement of respondent's officers and supervisors, which are now clearly lawful under Section 8(c) of the Act as amended in 1947.

"3. Whether, in the absence of those statements, the other acts relied upon by the Board are sufficient to show respondents dominated and interfered with the formation and administration of the Association, or showed support to the Association in violation of Sections 8(2) and 8(1) of the Act, so as to constitute an unfair labor practice."

These issues, as stated by respondents, assume that the Board's order was based primarily on statements of the respondents' officers and supervisors and, at least impliedly, admit that if the statements in question were properly received and considered by the Board as a part of the entire record, the Board's findings were supported by sufficient evidence.

Section 10(e) of the Act provides that: "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive."

The courts have uniformly and strictly adhered to this express limitation on their power to review the evidence in these cases. The decisions have uniformly held that it is for the Board to pass upon the credibility of the witnesses, to determine the facts and to draw inferences from the facts and that in these cases the courts should never substitute their judgment for the judgment of the Board. National Labor Relations Board v. Link Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368; International Ass'n of Machinists v. National Labor Relations Board, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50; National Labor Relations Board v. Waterman S. S. Co., 309 U.S.

206, 60 S.Ct. 493, 84 L.Ed. 704; N.L.R.B. v. Burry Biscuit Corp., 7 Cir., 123 F.2d 540; Valley Mould & Iron Corp. v. N.L.R.B., 7 Cir., 116 F.2d 760, certiorari denied, 313 U.S. 590, 61 S.Ct. 1114, 85 L.Ed. 1545.

■ Our examination of this entire record, including the statements and expressions of respondents' officers and supervisors, convinces us that there was substantial evidence to support the findings of the Board.

It is, therefore, our duty to enforce the order of the Board unless, as respondents contend, the consideration by the Board of the statements of respondents' officers and representatives was improper under Section 8(c) of the Act which provides: "The expressing of any views, argument, or opinion or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of any unfair labor practice under any of the provisions of this act, if such expression contains no threat of reprisal or force or promise of benefit."

Counsel for respondents earnestly contend that since the 1947 Amendment of the Act by the addition of Section 8(c), "unless the utterances or expressions (of the employer) *in themselves* contain a threat of reprisal or force, or promise of benefit that such utterances cannot be used as a basis by the Board for a finding of an unfair labor practice." In other words, counsel seem to contend that before any statement or expression by the employer may be considered such statement or expression must contain threatening or promising words, or words which considered together constitute a threat or a promise.

■ All admit that prior to the passage of this Amendment an employer had a perfect right, under the First Amendment to the Constitution, to express his views on labor organizations and to discuss the advantages and disadvantages of the same so long as such expressions or statements did not coerce the employees into a certain course of action and thereby deprive them of their rights and their freedom of choice guaranteed to them by Section 7 of the Act.

The decisions have pointed out that such statements, to be protected by the First Amendment, must neither constitute threats nor promises; that in determining whether such statements are protected, the surrounding circumstances should be taken into consideration; that the actions of the employer throughout the whole controversy may be considered in determining whether his statements tended to coerce; that his known hostility to one union may make seemingly trivial intimations of preference for another union powerful assistance for it; and that "slight suggestions as to the employer's choice between unions may have telling effect among men who know the consequence of incurring that employer's strong displeasure". International Ass'n of Machinists v. National Labor Relations Board, supra, 311 U.S. 72, 78, 61 S.Ct. 83, 88, 85 L.Ed. 50.

National Labor Relations Board v. Virginia Electric & Power Co., 314 U.S. 469, at page 477, 62 S.Ct. 344, 348, 86 L.Ed. 348, recognized the right of the employer, under the First Amendment, to speak but pointed out: "But certainly conduct, though evidenced in part by speech, may amount in connection with other circumstances to coercion within the meaning of the Act. If the total activities of an employer restrain or coerce his employees in their free choice, then those employees are entitled to the protection of the Act. And in determining whether a course of conduct amounts to restraint or coercion, pressure exerted vocally by the employer may no more be disregarded than pressure exerted in other ways." See, also, Valley Mould & Iron Corp. v. N.L.R.B., supra, and N.L.R.B. v. Continental Oil Co., 10 Cir., 159 F.2d 326.

Thus we see that prior to the 1947 Amendment, the Courts did not look just to the words of the statement or expression of opinion to determine whether such statements or expressions were protected by the First Amendment, but, instead, considered such statements in connection with the relation of the parties, the entire course of conduct of the employer and as a part of "the pattern" disclosed by the entire record.

Counsel for the respondents recognize that prior to the 1947 Amendment the courts did not consider it necessary that the employer's statements should "in themselves" contain threats or promises in order to be used as a basis for a finding of an unfair labor practice, but insist that, "It was exactly the type of case here involved that the 1947 Amendment corrected." However, in the decisions which have been announced since 1947, we find the courts determining the validity of statements and expressions in the same manner as they did prior to the Amendment.

In N.L.R.B. v. Gate City Cotton Mills, 5 Cir., 1948, 167 F.2d 647, the court held that the employer's conduct was not protected by Section 8(c) of the Act. The court there said, 167 F.2d at page 649: "Employers still may not, under the guise of merely exercising their right of free speech, pursue a course of conduct designed to restrain and coerce their employees in the exercise of rights guaranteed them by the Act."

In N.L.R.B. v. Ford, 6 Cir., 1948, 170 F.2d 735, decided November 15, 1948, the court in citing one of the earlier opinions, N.L.R.B. v. Peterson, 6 Cir., 157 F.2d 514, 515, said: "If they are couched in such phrases, or attended by such circumstances that they tend to exercise undue influence and coercion upon the employees, the expressions of opinion are not protected."

In Sax v. N.L.R.B., 7 Cir., 1948, 171 F.2d 769, 773, this court held that certain words and statements were not in violation of Section 8(1) where they were "mere words of interrogation or perfunctory remarks not threatening or intimidating in themselves made by an employer with no anti-union background and not associated as a part of a pattern or course of conduct hostile to unionism or as part of espionage upon employees", thereby indicating, of course, that statements or expressions must still be considered as a part of their general pattern or background in cases where such pattern or background throws light upon the significance of such statements or expressions.

In N.L.R.B. v. Fulton Bag and Cotton Mills, 5 Cir., 1949, 175 F.2d 675, 677, in considering whether certain questions and statements were protected, the court said: "We think, though, that when the questions and statements complained of are taken not merely by themselves but in the connection in which they were made, it may not be said that the Board's findings, that there was interference with self-organization are without support in the evidence * * *."

As this court said in N.L.R.B. v. LaSalle Steel Company, 7 Cir., 178 F.2d 829, the language of Section 8(c) "seems to us no more than a restatement of the principles embodied in the First Amendment * * *."

It also seems clear to us that in considering whether such statements or expressions are protected by Section 8(c) of the Act, they cannot be considered as isolated words cut off from the relevant circumstances and background in which they are spoken. A statement considered only as to the words it contains might seem a perfectly innocent statement, including neither a threat nor a promise. But, when the same statement is made by an employer to his employees, and we consider the relation of the parties, the surrounding circumstances, related statements and events and the background of the employer's actions, we may find that the statement is a part of a general pattern which discloses action by the employer so coercive as to entirely destroy his employees' freedom of choice and action. To permit statements or expressions to be so used on the theory that they are protected either by the First Amendment or by Section 8(c) of the Act, would be in violation of Section 7 and contrary to the expressed purpose of the Act. Therefore, in determining whether such statements and expressions constitute, or are evidence of unfair labor practice, they must be considered in connection with the positions of the parties, with the background and circumstances under which they are made, and with the general conduct of the parties. If, when so considered, such statements form a part of a general pattern or course of conduct which constitutes coercion and deprives the employees of their free choice guaranteed by

Section 7, such statements must still be considered as a basis for a finding of unfair labor practice. To hold otherwise would nullify the guaranty of employees' freedom of action and choice which Section 7 of the Act expressly provides. Congress, in enacting Section 8(c) could not have intended that result.

We, therefore, hold that the statements and expressions here in question were properly considered by the Board as constituting, and as evidence of, unfair labor practice by respondents.

The order of the Board will be enforced.