**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**GEORGIA RUG MILL, Respondent.**

**No. 19223.**

United States Court of Appeals Fifth Circuit.

Sept. 18, 1962.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Allison W. Brown, Jr., Atty., N. L. R. B., Washington, D. C., for petitioner.

Frank A. Constangy, Atlanta, Ga., for respondent.

Before BROWN, WISDOM and BELL, Circuit Judges.

WISDOM, Circuit Judge.

The National Labor Relations Board seeks enforcement of its order that the respondent, Georgia Rug Mill, cease violating Section 8(a) (1) of the Labor Management Relations Act, 29 U.S.C.A. § 158(a) (1) and that it reinstate two employees dismissed in contravention of Section 8(a) (3). The Board's decision and order are reported at 131 NLRB, No. 160. Georgia Rug Mill raises scarcely a murmur against the first charge, and, while not conceding that it violated the Act, does not resist enforcement of the cease-and-desist order. The controversy centers on the discharge of the two employees who, according to the Board's findings, were dismissed because of their union activities. In testing the Board's findings, we apply the same test of substantiality of evidence to reinstatement cases as to other cases under the Act. N. L. R. B. v. Walton Manufacturing Co., 1962, 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed. 2d 829. The rule of review, as stated in Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, is the same in all Labor Board cases, and the Board's findings will be set aside only "when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both."

### I.

Both the Trial Examiner and the Labor Board found that George Gaines was dismissed by the Georgia Rug Mill because of union activity. We agree.

Gaines was an unabashed union supporter. He attended meetings, spoke in favor of the union "all over the mill," and persuaded employees to sign union cards. The pretext for firing Gaines arose when he purportedly over-stayed a leave he had requested. When he reported to work after three days absence, he discovered that his timecard had been removed from the rack. He was told to report to Gregg, his supervisor, in the morning. When he did so, Gregg accused him of over-staying his leave. Gaines denied this. There was a heated exchange, enlivened by obscenities. During the course of the quarrel Gregg stated that he had heard Gaines was working for the union. Gregg finally told Gaines, "[Y]ou was fired yesterday when you didn't come in." Gaines ended the interview by threatening to give Gregg a beating if he ever caught him outside the mill.

The Company explains that Gaines's leave was for two days, not three; that

when Gaines failed to report for work on the third day, his foreman removed his timecard and instructed him to report to Gregg the next morning; that the purpose was to find out whether Gaines had a valid excuse for over-staying his leave. The Company contends that when questioned, Gaines became obscene and insubordinate and, because of this, was fired.

There are several flaws in the Company's interpretation of the incident. First, it assumes that Gaines unquestionably over-stayed his leave. The evidence, however, was conflicting whether he had asked for two or three days off. The Trial Examiner found that Gaines had actually requested a three-day leave; the Board found it unnecessary to resolve the question. The Trial Examiner's finding is supported by the evidence, at least to the extent that the Company supervisors themselves were unsure as to the length of the leave which Gaines had requested. Although Gregg, his supervisor, testified that Gaines had asked for a two-day leave and that he had written a leave-of-absence notice for such a period that same day, the testimony shows that on the following Monday, when Gaines had been gone only one work-day, Gregg asked Gaines's substitute, Reynolds, how long he was going to fill in for Gaines. Moreover, on Tuesday night, when Gaines would have been expected back had his leave been for only two days, Reynolds "was told to stay a few minutes and see if [Gaines] did come in." This evidence would indicate that there was at least some doubt in the minds of Gaines's immediate superiors as to the duration of Gaines's leave.

There is testimony that the decision to fire Gaines was arrived at the day before the dispute took place between Gaines and Gregg. Another employee testified that the day before Gaines was discharged, Brooks, a foreman, asked him if he would "be interested in a hyster [fork lift] job" for the third shift because they were "going to fire a boy" for "talking too much." Gaines at that time was the hyster operator on the third shift. Moreover, Gregg told Gaines during their quarrel that he had been dismissed the previous day. This interpretation of the evidence, which both the Board and the Trial Examiner apparently accepted, is strengthened by the fact that Gaines's timecard had already been removed when he reported back for work.

Gaines's insubordination is only the last of four explanations the Company gave at different times for Gaines's discharge. Supervisor Brooks told an employee that Gaines was going to be fired for "talking too much"; Gaines's separation notice stated that he was discharged because he over-stayed his leave and because of "his past record"; finally, the Company took the position that Gaines was really dismissed because of his insubordination and use of abusive language on Gregg. When an employer shifts position several times in explaining why an employee has been fired, his own case is weakened, and the Board's conclusion that the true reason was for union activity is correspondingly strengthened. See N. L. R. B. v. International Furniture Co., 5th Cir.1952, 199 F.2d 648.

The evidence of the Georgia Rug Mill's general anti-union activity stands almost undisputed in the record. Although "a general bias or a general hostility and interference, whether proved or conceded, does not supply the element of purpose," which must be established with respect to each discharge, "anti-union bias and demonstrated unlawful hostility are proper and highly significant factors for Board evaluation in determining motive." N. L. R. B. v. Dan River Mills, Inc., 5th Cir.1960, 274 F.2d 381, 384. There is support for the finding that the Company's anti-union policy was directed against George Gaines specifically. When Brooks offered Gaines's job to another employee, he stated that Gaines had "been talking too much." Several weeks later, Brooks, in threatening an employee that he "couldn't expect to get a job in that county," if he were "fired on account of the union,"

used Gaines as an example. When asked if it were not "against the law to fire people on account of the union," Brooks retorted, "Yes. But you don't have to put that on the papers. Look what happened to Walt Hughes, Chester Bridges and George Gaines. The law hasn't helped them any so far. * * * All they can do is file unfair labor charges." It is also noteworthy that Gregg, in his altercation with Gaines, accused him of "working for the union." These statements, reinforced by Gaines's open and active promotion of the union, clearly establish an "unlawful motive" on the part of the Rug Mill for Gaines's dismissal, and the employer's explanation is not "so overwhelming" as to make the controverting evidence "unacceptable as a matter of law." N. L. R. B. v. Jackson Tile Mfg. Co., 5th Cir.1960, 282 F.2d 90, 92.

The Labor Board's finding that George Gaines's union activity was the real cause of his dismissal is clearly supported by substantial evidence on the record as a whole.

## II.

It is much less clear that Walter Hughes was dismissed because of union activity. Since 1958 Georgia Rug Mill has had a policy of dismissing any employee whose wages are garnished twice within three months. The policy permits exceptions in special extenuating circumstances. The policy is reasonable: A company has an unassailable right to avoid, if it can, harassment by creditors of its employees and the inconvenience and cost of making an appearance in court. The Company's experience with Hughes illustrates why this rule was established. As far back as early in 1958, the Company began to receive dunning letters from his creditors. On January 13, 1960, the Company received its first garnishment of Hughes's wages. At that time Dunson, the personnel manager, warned Hughes of the three-month rule and told him "to look after his own credit," because the Company had been receiving complaints from other creditors in addition to the garnishor. The complaints continued for the next three months. Dunson testified that he was pestered by telephone calls from creditors asking him to get Hughes to pay his debts. Written complaints also continued to flow in. Two months after the garnishment the Company received another letter from Montgomery-Ward, which had been writing to the Rug Mill since December, 1958, in an effort to collect on a debt Hughes owed. April 6, the Company received a notice from C & S Jewelers, threatening a garnishment. The next day another company, the Rome Hardware Store, instituted a garnishment action. About this same time, still another creditor advised the Rug Company that it was contemplating instituting a garnishment action. Dunson, upon receiving the second garnishment, conferred with Roberts, the production manager. After reviewing the history of Hughes's bad credit relations, Roberts ordered Hughes dismissed.

Whatever the National Labor Relations Board or this Court may think of the wisdom of the Company's rule as to excessive garnishments,

> "management is for management. Neither Board nor Court can second-guess it or give it gentle guidance by over-the-shoulder supervision. Management can discharge for good cause, or bad cause, or no cause at all. It has, as the master of its own business affairs, complete freedom with but one specific, definite qualification: it may not discharge when the real motivating purpose is to do that which Section 8(a) (3) forbids." N. L. R. B. v. McGahey, 233 F.2d 406, 413 (5th Cir.1956).

Unless, therefore, the rule was discriminatorily applied to Hughes because of the Company's anti-union bias, he cannot be ordered reinstated.

The Board insists that two factors point clearly to discrimination. First,

the rule was not rigidly enforced. In the past, if there were extenuating circumstances, the employee was not dismissed; and Dunson admittedly made no effort to discuss Hughes's financial plight before firing him. But to Dunson, already exasperated by the number and perseverance of Hughes's creditors, the final batch of threats of garnishment was enough. There was no indication whatsoever of any extenuating circumstances or personal hardship in Hughes's situation; one complaining creditor was a jewelry store, and the second garnishment involved a debt which Hughes had contracted in connection with a private business he had operated. Proof that a rule is flexible is not tantamount to a showing of discrimination, if there is reason for its strict application. To Dunson's personal knowledge, at least three other employees had been dismissed because of excessive garnishments. Thus Hughes was not alone in feeling the brunt of the company policy.

Second, the Board urges that its finding of discrimination against Hughes is supported, not only by circumstantial evidence, but by direct proof in the form of statements by his supervisors. Hughes testified that "a couple of months" before he was dismissed, he complained to his supervisor, Petitt, that he was not receiving his share of overtime work, and Petitt had replied that Hughes was "working against the company," and "working with these union boys." Another employee, Sentell, testified that Brooks, another supervisor, had said that Walter Hughes, Chester Bridges, and George Gaines had been fired for union activity. Sentell then asked Brooks if Hughes had not been dismissed because of excessive garnishments and if other employees had not been garnished. Brooks replied that they had, but that the Company "tried to take care of people that wanted to do right and were on the right side of the fence." Brooks, however, was not Hughes's supervisor. The Board has agreed with the finding of the Trial Examiner that Chester Bridges, also mentioned by Brooks as being discharged for union activity, was actually fired for incompetence.

The most telling factor against the Board's interpretation, however, is the chronology involved in the Hughes incident. Hughes's record of union activity, unlike that of Gaines, is very slim. Although Hughes apparently had always "believed in" the union, he took no part in any union activity until a union meeting on January 24. Hughes was warned about his garnishment no later than January 15 and told *then* that if he received another one within three months, he would be discharged. All of this took place prior to Hughes's participation in the union and before anything was said that could be construed as a threat about his union activity.

■■ The Trial Examiner, crediting Dunson's statement that "if a person gets two garnishments within a period of three months, then that is an automatic discharge" and relying upon Hughes's very bad credit standing, found that Hughes's dismissal because of union activity had not been established by a preponderance of the evidence. "This conflict [between the Trial Examiner's finding and that of the Board] does not change the criterion we must follow in reviewing the decision of the Board." N. L. R. B. v. Dell, 5th Cir. 1960, 283 F.2d 733, 735. But the Examiner's findings must be considered along with the record as a whole in determining whether there is substantial evidence to support the Labor Board's decision. As the Supreme Court recently reiterated in N. L. R. B. v. Walton Manufacturing Co., 1962, 369 U.S. 404, 82 S.Ct. 853, 855, 7 L.Ed.2d 829,

"the Examiner—the one whose appraisal of the testimony was discredited by the Court of Appeals in Florida Citrus Canners Coopera-

94

tive case [N. L. R. B. v. Florida Citrus Canners Cooperative, 5 Cir., 288 F.2d 630]—sees the witnesses and hears them testify, while the Board and the reviewing court look only at cold records. As we said in the Universal Camera case: '* * * The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case.' 340 U.S., at 496 [71 S.Ct. at 469]. For the demeanor of a witness '* * * may satisfy the tribunal, not only that the witness' testimony is not true, but that the truth is the opposite of his story; for the denial of one, who has a motive to deny, may be uttered with such hesitation discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies.' Dyer v. MacDougall [2 Cir.], 201 F.2d 265, 269."

This, then, is a case in which the Trial Examiner's report should be given significance; for, as the Trial Examiner recognized, it "presents for the most part, if not entirely, a pure credibility problem."

▮ Taking into consideration the evidence in the record as a whole, both that supporting the Board's decision and that contradicting it or from which conflicting inferences can be drawn, we find that there is not substantial evidence warranting the Board's finding that participation in union activity was the reason for Hughes's discharge.

The Board's cease-and-desist order and its order for the reinstatement of Gaines with back pay will be enforced. Enforcement of the order as to Hughes is denied.