**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**AMERICAN COMPRESS WAREHOUSE, DIVISION OF FROST–WHITED COMPANY, Inc., Respondent.**

No. 20029.

United States Court of Appeals Fifth Circuit.

Aug. 13, 1963.

Rehearing Denied Sept. 23, 1963.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Warren M. Davison, Atty., N. L. R. B., Washington, D. C., for petitioner.

Joe P. Mathews, Dallas, Tex., for respondent.

Before RIVES, LEWIS,* and BELL, Circuit Judges.

LEWIS, Circuit Judge.

The National Labor Relations Board found that respondent had violated Section 8(a) (1) [1] of the National Labor Relations Act by questioning its employees concerning their union sympathies and that it had violated Section 8 (a) (3) [2] and (1) of the Act in discharg-

---

* Of the Tenth Circuit, sitting by designation.

1. 29 U.S.C.A. § 158(a) "It shall be an unfair labor practice for an employer—
   "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; * * *"

2. 29 U.S.C.A. § 158(a) "It shall be an unfair labor practice for an employer—
   "(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: * * *"

ing one employee, Littleton, and refusing to rehire two seasonal employees, Comick and Sims, because of their union affiliation. The Board seeks enforcement of its order requiring the employer to cease from infringing upon the rights of employees guaranteed in the Act and to reinstate with back pay the three employees whose rights were found to have been violated.

■ The respondent is engaged in compressing and warehousing of cotton, with plants in four cities in Louisiana. The two plants here involved are the Shreveport and Natchitoches plants, where United Packinghouse, Food and Allied Workers, AFL–CIO, began an organizational campaign in late 1960 and achieved a Board order on June 21, 1961, that a representation election be conducted. All of the events relied upon by the Board in its findings took place subsequent to the order and demonstrate the tension generated by the organizational attempt. The Board's determination that there existed Section 8(a) (1) violations was not excepted to below and hence is not here open for consideration, Section 10(e) National Labor Relations Act, 29 U.S.C.A. § 160(e); N. L. R. B. v. Ochoa Fertilizer Corp., 368 U.S. 318, 82 S.Ct. 344, 7 L.Ed.2d 312, but the evidence relating particularly to that charge forms a background and aids in the interpretation of the facts surrounding the discharge and refusal to rehire the named employees.

The respondent's business is largely seasonal. Although it regularly employs sufficient year-round workers to man the operation, respondent hires many more in the fall when the cotton is harvested and processed. The seasonal employees return year after year in the expectation of receiving employment during the season of full operation. In the fall of 1961, the hiring practices took on a different flavor when the seasonal employees were questioned as to how they felt about unionism and it was intimated that, if they "could forget about the union", work might be available to them. A plant superintendent told an employee that

Comick was trying to organize a union at the plant and that he would never work there again. An employee working at the plant at that time was told that if he were for the union, he was "going to get messed up" and that he could only "tie" cotton and not put in more time on other jobs.

The discharge of Littleton was precipitated by a conversation between him and Dupuy, a plant superintendent. Dupuy opened the conversation by asking Littleton what he thought about this "damn union", Littleton responded noncommittally, and Dupuy continued to prod him, reminding him of the insurance benefits the company had given its employees. The conversation was heated and at this point, Littleton replied:

"I said to him, 'I get $2,000, why you always telling me that?' I said, 'I put myself in the insurance. If you don't do something I will do something for myself'."

According to the company, this statement was a shockingly insubordinate expression of ingratitude for which the company discharged Littleton the next day. Littleton, however, interpreted the entire conversation as an invasion of his rights to vote his convictions as to union representation:

" * * * it was not because of the fact he asked me about the union, I know what he was asking was about the union, what way I was going to vote, and I didn't give him the decision he wanted."

Littleton's interpretation of the conversation is validated by its conclusion, which was reported by Littleton to be:

"He said, 'Well goddamn, I don't need the goddamn union. I don't need it. I will soon be ready to retire.' He turned off from me to go away and he said, 'Now, listen, this is only between me and you. Don't say anything to anybody about it'."

■ At the time Littleton was discharged he was told that this conversation was the cause. The company offers no further reason but insists that Little-

ton's subjective state of mind does not insulate him from the natural results of his insolent renunciation of company policies. It asserts that it could have no way of knowing how Littleton would vote in the upcoming election and that his discharge was not connected with the inquisition concerning the union being conducted at that time. Suffice it to say, that the evidence of the conversation and the coincidence of time of the election and other statements of pressure against the union rather clearly light the inference drawn by the Board that Littleton was fired because of his militant predisposition towards unionism. See N. L. R. B. v. Georgia Rug Mill, 5 Cir., 308 F. 2d 89; N. L. R. B. v. C. & J. Camp, Inc., 5 Cir., 216 F.2d 113.

During the summer of 1961, a new system of processing applications for employment was adopted by the respondent requiring that written applications be submitted on the form supplied by the company. Thus, several seasonal workers were called and invited to fill out an application form—in some instances, after they had been questioned on their attitudes toward the union. A wrong answer apparently disqualified them for work.

Sims, who had worked seasonally for 12 years, applied for work in the fall of 1961 on union stationery; he made a second application on the company form but was told by Superintendent Dupuy, "You don't want to work for us if you are going to work for Homer Ford (an employee organizer) and the union." He was not hired and the respondent now maintains that he was rejected because of an illness resembling epilepsy which would endanger the plant and other employees. Significantly, he had passed required physical examinations for the preceding 12 years. Cf. N. L. R. B. v. Griggs Equipment, Inc., 5 Cir., 307 F.2d 275.

Respondent points out that there is nothing in the record to indicate that Sims was unusually active in the organization movement and that the respondent had hired several men who applied on union stationery. Although several conflicting inferences might be drawn from the evidence concerning this employee, the Board chose to believe the testimony of Sims regarding the statement of Dupuy at the time of the refusal. There is substantial evidence throughout the record to support the Board's finding that the refusal to rehire Sims was discriminatory and in violation of Section 8(a) (3).

J. C. Comick, a seasonal employee like Sims, applied for work at both plants on union letterhead. He received no response and discovered from other employees that it was necessary to fill out a company application. However, by the time he was apprised of the new policy on hiring, the major seasonal hiring had been done, and he was informed that a superintendent had said of him,

"* * * it looks like J. C. was trying to organize a union there and he never would work there no more."

During the late summer months of 1961 Comick was in fact acting as local representative to the union for the employees at the Natchitoches plant. Respondent asserts that other than the statement of the superintendent the record does not demonstrate that the company had knowledge of Comick's union activities. The statement is sufficient, without the inferences of the inherent probabilities, to sustain the Board's conclusion that Comick was not called by the company in accordance with its past practice because of his union activities.

Comick did not comply nor attempt to comply with the company's new procedures concerning seasonal employment, but the company was informed by reason of the union application that he was available for employment. Formerly, he had been sought out by the company even without the notice given by the union application. There is no suggestion in the record of a basic reason other than his union activities that would make him undesirable as an employee at this time. The finding of the Board with re-

gard to the discriminatory nature of the refusal to rehire Comick is thus supported by substantial evidence on the record as a whole.

The Board's order will be enforced.