## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### DIXIE GAS, INC., Respondent.

### No. 19844.

United States Court of Appeals
Fifth Circuit.

Oct. 1, 1963.

Rehearing Denied Dec. 9, 1963.

Cameron, Circuit Judge, dissented.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, William J. Avrutis, Atty., Stuart Rothman, Gen. Counsel, N. L. R. B., Washington, D. C., for petitioner.

Richard C. Keenan, New Orleans, La., J. A. Lake, Wynn, Hafter, Lake & Tindall, Greenville, Miss., Kullman & Lang, New Orleans, La., for respondent.

Before PHILLIPS,* CAMERON and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

The National Labor Relations Board petitions for enforcement of its order of February 1962 against Dixie Gas Inc. The Board found, as did the Trial Examiner, that the respondent violated Sections 8(a) (1) and 8(a) (3) of the National Labor Relations Act (61 Stat. 136, 29 U.S.C.A. § 151 et seq.). 135 N. L.R.B. No. 104.

Dixie Gas, a company engaged in buying, selling, and transporting liquefied petroleum products, maintains its principal office and a truck terminal at Leland, Mississippi. In this dispute the employees involved are truck drivers. The charging party is the General Drivers, Salesmen & Warehousemen's Local Union No. 984, the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America. In a representation election the drivers, by a close vote, 13–8, voted for the Union.

## I.

The terminal includes a fenced-in area which surrounds a large garage in one

* Of the Tenth Circuit, sitting by designation.

corner of which is an office. The terminal provides facilities for repairing, fueling, maintaining, and dispatching the large trailer-type tank trucks used principally to haul butane and propane gases compressed to liquid form. Many of the drivers have had long service with the Company. Curry Holland, a former truck driver, who has been with the Company since it began business in 1947, is Vice-President and General Manager of the Company.

A week before the election, Holland wrote the employees a pro-Company letter describing the privileges they enjoyed:

"There is now no regimentation, no watchdog, no timekeeper, et cetera. In fact, we have freedom of mind due to the fact that each man here is practically on his own.

"Freedom on all runs, coffee stops, breaks, et cetera.

"Loans to employees. Legitimate personal loans have never been denied, all without interest. If six percent had been charged on loans made to employees in the last 12 months it would have amounted to over $600.

"Purchasing power.. We have given all employees the privilege of buying at our cost for personal use tires, parts, et cetera."

That was before the election. After the election, the Company curtailed or withdrew many of the privileges the employees had enjoyed. Thus, (1) *before* the election, drivers—they were paid by the trip—had been free to leave on their runs at their own convenience; *after* the election, the gates were opened at 4:30 a. m. and the loaders were required to leave by 5 a. m. (2) *Before,* the Company allowed the drivers to exceed the speed limit; *after* the Company held the drivers to strict obedience to speed limits. (3) *Before,* drivers could take as many coffee breaks as, when, and where they chose; *after,* the Company limited them to one every 75 miles, of no more than 15 minutes duration, during which times

tires were to be checked. (4) *Before,* the Company allowed the drivers to park their own cars within the terminal's fenced area, whether or not the car had an illegal (unlicensed) butane system; *after,* the Company allowed no cars in the area which had an illegal butane system. (5) *Before,* the Company allowed the drivers to purchase tires and automobile parts on Company credit without prior authorization; *after,* the Company required the drivers to secure purchase orders from the Company. (6) *Before* the election, drivers could remain at the terminal stop after their runs, work on their own cars, and kill time there; *after* the election the drivers were required to leave the terminal promptly on the completion of their runs.

Although some of these changes may have been made in the interest of safety or efficiency, it is a fair inference that the Company was primarily motivated by an intention to penalize its employees for their vote in the election. It was reasonable therefore for the Board to find that the Company, by making working conditions more onerous and by withdrawing or curtailing pre-election privileges and favors, had punished its employees for exercising their statutory rights under the Act. Taking the record as a whole, substantial evidence supports this finding. Such conduct is coercive. N. L. R. B. v. Gate City Cotton Mills, 5 Cir. 1948, 167 F.2d 647; Winter Garden Citrus Cooperative v. N. L. R. B., 5 Cir. 1956, 238 F.2d 128; N.L.R.B. v. Deena Artware, Inc., 6 Cir. 1952, 198 F.2d 645, cert. den'd 1953, 345 U.S. 906, 73 S.Ct. 644, 97 L.Ed. 1342.

## II.

The evidence is hopelessly conflicting on the question whether Dixie Gas discriminatorily discharged three employees, Phillips, McDaniel, and Burns, in violation of Section 8(a) (3) of the Act.

Some facts are not in conflict. There is no doubt that Roy Divine, the principal witness for the Company, had strong anti-union feelings, especially

against the Teamsters. The organization campaign and the election created an extremely tense situation. Some of the drivers carried a gun or a revolver,[1] and the harried Examiner, on his initiative, asked the civil authorities to intervene. Tempers ran high on both sides. Many of the truck drivers Dixie Gas employed would have qualified as mule skinners in an earlier day. In the heat of dispute they indulged in no nicely-nicely worded badinage. It was not unreasonable therefore for the Trial Examiner to make some allowance for cursing, obscenity, and profanity, for, let us say, general vigor of expression that in other circumstances would be inexcusable misconduct.

The 8(a) (3) aspects of this case revolve around Roy Divine and the extent to which he told the truth. The Company's brief, filed with the Trial Examiner, stated that the discharge cases will turn, "in a more marked degree than usual, upon the resolution of the credibility issues." The Union agreed. For almost two entire days the Trial Examiner observed and listened to Divine testify. The Examiner characterized Divine in these terms:[2]

> "[Divine is] a highly volatile, verbose, and self-dramatizing individual, patently given to exaggeration

and to exhilaration in unwinding a strongly-flavored story * * * [A]ll due consideration being given to such reluctance, evasiveness, or lack of candor as was also shown by several other witnesses, my intensive study of the details in the recorded evidence and my painstaking weighing of all credibility factors have confirmed the general impression which I had at the close of the hearing, after due observation of the demeanor of the witnesses, namely, that of all witnesses called, Divine made the poorest over-all impression and was the least credible."

The Board accepted the Examiner's credibility findings.

The Supreme Court has recently reiterated the point that the Trial Examiner "sees the witnesses and hears them testify, while the Board and the reviewing court look only at cold records". N. L. R. B. v. Walton Manufacturing Co., 1962, 369 U.S. 404, 82 S. Ct. 853, 7 L.Ed.2d 829. "The significance of his report, of course, depends largely on the importance of credibility in the particular case. * * * [f]or the demeanor of a witness' * * * may satisfy the tribunal, not only that the witness' testimony is not true, but

---

1. The evidence showed that none of the three discharged employees carried a weapon.

2. The Trial Examiner also stated in his report:

   "From Divine's own testimony, we learn that he sometimes was more interested in the effect he desired to get with his fellow employees than he was with the truth about what he had to tell them. For instance, Divine, who insisted during his testimony that he had not actually done so, admittedly told others as 'just scare talk' that he had killed two men at whom he had become angry and that he had served time in a penitentiary for it. Also Divine, whom I am satisfied was, as he testified having an affair with another woman, has told people that he is not really married to his wife, but that she is just acting as the guardian of his children. Moreover, Divine's description of an occasion, upon which he obviously

was spying on a meeting of drivers interested in the Union, unmistakably indicates his stark lack of respect for the privacy of another's home. And then there is the fact that Divine recently challenged one of the drivers, Robert Webb, to a duel with either knives or guns. Nor should we be unmindful of Divine's testimony that he once had 'worked as a bouncer'; that he had 'a little judo training' and knows 'how to use a knife'; that he is 'about as good a shot with a rifle' as one would find; and that he is so trained in taking care of himself that he can 'whip one man easily' but with 'two men the chances grow.' "

   "No purpose would be served by exhausting the record illustrations, in substantial part in Divine's own testimony, of Divine's dislike of the Teamsters, his fearlessness and proficiency in the use of force, or his facility in employing deception to further his own ends."

that the truth is the opposite of his story." Ibid. As we said in N. L. R. B. v. Georgia Rug Mill, 1962, 5 Cir., 308 F.2d 89, 94, "This, then, is a case in which the Trial Examiner's report should be given [great] significance; for, as the Trial Examiner recognized, it 'presents for the most part, if not entirely, a pure credibility problem' ".

The respondent contends that Holland discharged Phillips, McDaniel, and Burns, not from any discriminatory motive but because they had subjected their fellow employees to threats of violence, and had engaged in serious misconduct intended to create an atmosphere of fear among the workers. Holland justifies the discharges on Divine's statements to him about the three men. The key role Divine played is evident if we run over briefly some of the Company's specific contentions.

As to Phillips, Divine allegedly informed Holland that before the election Phillips threatened Divine with violence if he ever crossed a picket line during a strike; told Divine that Hammock, another driver, would be run off the job because he would not vote for the Union; showed Divine a photograph of himself in a compromising position in an automobile with a woman who was not his wife, and threatened Divine with exposure if he persisted in opposing the Union; and told Divine he would run John Cotton off the road if he drove a truck during a strike. As to McDaniel's pre-election offenses, the Company contends that he threatened to "sweep [Divine] out of the shop" if he did not cease campaigning against the Union; threatened to sweep employees Sims and Poag out of the shop; cursed Poag in a violent manner; threatened Divine that he would be killed if he drove during the strike; and threatened Divine with "the picture." As to Burns, the Company avers that Burns telephoned his fellow driver Ware, asked him how he stood and whether he was not afraid someone would kill him.

Dixie Gas contends that Phillips, McDaniel, and Burns were also guilty of the following post-election offenses: Burns threatened Ware with loss of his job; McDaniel made a second effort to blackmail Divine with the photograph; Phillips, McDaniel, and Burns together threatened Divine and intimidated him in a cross-cursing, gun-pulling, loud-shouting session at Hico.

"The picture" is central to extensive and conflicting testimony. Divine's statements in regard to it are especially hard to believe. Divine testified that two or three weeks before the election, while drinking coffee with Phillips, Phillips briefly showed him a picture of himself and "Evelyn", a "friend", taken at about noon near Bastrop, Louisiana, when he had been on the front seat of her parked automobile, "hugging and kissing" Evelyn. Divine got "killing mad" and told Phillips that he would kill "two son of a bitches" for a lot less than that. But he did not try to take the picture from Phillips; he said that his wife would not care anyway; he called the waitress and told her to telephone his wife that she was "going with him across the bridge in a truck". The waitress testified that Divine "seemed to be mad", but she had not seen the picture. Phillips flatly denied that he had ever had such a picture, ever told Divine he had such a picture, ever pretended to have such a picture, or knew of anyone else having such a picture, or had ever threatened or intimidated Divine by a picture or any other means. Divine testified that he did not see the picture taken nor did he see a camera at the time. The Trial Examiner observed:

"I do not believe that one of Divine's temperament would have reacted the way in which he claims that he did, either with Phillips or thereafter with respect to the later-discussed Hico incident, about what was, by his own description, not a lewd or even a particularly amorous picture, especially when his romancing another woman was no secret, and he was telling people that he was not even married to his own wife. * * I further conclude and find, particu-

larly in view of the above-enumerated denials of Phillips, which were convincingly given, that Phillips never possessed, knew anything about, displayed to Divine, or discussed with Divine, any picture of Divine and woman not his wife, and that Phillips at no time in no way threatened, coerced, or attempted any blackmail or extortion of any kind with respect to Divine's activities concerning the Union by the use of any such picture or item."

The Examiner, approved by the Board, found that Phillips had never threatened Divine, had never told him that he, or the Union, would cause Hammock to lose his job, and had never threatened to run Cotton off the road; that McDaniel had only nonviolent name-calling disagreements with Divine, Sims, and Poag; that Divine's charges merely afford "examples of the way in which he exaggerated, distorted and embellished numerous events." As to Ware, the Board chose to believe Burns, Phillips, and a third employee, who had heard Phillips's end of his allegedly threatening telephone call. They denied that Ware was threatened. In weighing the evidence relating to alleged post-election offenses, the Board again chose to believe the Union witnesses.

An important element in this case, to which the Board gave proper weight, is the fact that the three discharged employees were senior drivers who had long years of satisfactory service with the Company. The Company disregarded this past service to the Company and placed its reliance on the statements of Roy Divine. At the time the men were discharged, the Company refused to give any explanation for its action. Each man received a letter stating that he was fired for "misconduct", but Holland declined to discuss it, except to say, "If you don't know, I am not going to tell you."

As we reviewed the record, we found ourselves questioning whether, had we been the Examiner, we would have swallowed, without gagging, all of the testimony of Phillips, McDaniel, Burns, and other pro-Union employees. And whether we would have regurgitated all of the testimony of Divine, Holland, and other anti-Union employees. But we were not the Examiner.

"It is generally held that whether made by jury, judge or agency a determination of credibility is non-reviewable unless there is uncontrovertible documentary evidence or physical fact which contradicts it." Jaffe, Judicial Review: Question of Fact, 69 Harv.L.Rev. 1020, 1031 (1956). As Justice Frankfurter said in his dissent in *Walton*, the rule of deference to credibility findings may not be quite so "unyielding" as to "require appellate impotence". 369 U.S. 404, 418, 419, 82 S.Ct. 853, 7 L.Ed.2d 829. See also Davis, Administrative Law Treatise, § 29.06, p. 145. Thus, in N.L.R.B. v. Pittsburgh S.S. Co., 1951, 337 U.S. 656, 69 S.Ct. 1283, 93 L.Ed. 1602, the Supreme Court upheld the Board against the contention that it showed bias to credit all of the general counsel's witnesses and to discredit all of the respondent's witnesses, but the Court excepted from the general rule of deference to credibility findings credited testimony which "carries its own death wound" and discredited testimony which "carries its own irrefutable truth". In this case neither of these exceptions nor any other exception justifies departure from the general rule.

■ Substantial evidence supports the Board's finding. The petition for enforcement of the Board's order is Granted.

CAMERON, Circuit Judge, dissenting.

Rehearing denied; CAMERON, Circuit Judge, dissenting.