**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SUPERIOR SALES, INC., Respondent.**

**No. 18160.**

United States Court of Appeals
Eighth Circuit.

Sept. 26, 1966.

**230**

Malcolm D. Schultz, Atty., N.L.R.B., Washington, D. C., for petitioner. Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, and Melvin Pollack, Atty., N.L.R.B., Washington, D. C., with him on the brief.

Irvin C. Levin, Omaha, Neb., for respondent. Jerry M. Gitnick, Omaha, Neb., with him on the brief.

Before JOHNSEN and BLACKMUN, Circuit Judges, and YOUNG, District Judge.

GORDON E. YOUNG, District Judge.

The National Labor Relations Board pursuant to § 10(e) of the National Labor Relations Act, as amended, 61 Stat. 136, 73 Stat. 519, 29 U.S.C.A. § 151 et seq., has petitioned this court to enforce its order issued against Superior Sales, Inc., on April 13, 1965. In its decision and order, reported at 151 NLRB No. 155, the Board adopted the findings, conclusions, and recommendations of the trial examiner and found that Superior Sales, Inc. (respondent hereinafter) had violated § 8(a) (3) and (1) of the National Labor Relations Act by discharging employee Maxine Chapman because of her activities on behalf of the union.[1] The Board also found that respondent made certain promises of benefits which violated § 8(a) (1) of the Act, and, finally, the Board found that respondent refused to bargain in good faith with the union in violation of § 8(a) (5) of the Act.

The order which we have been requested to enforce requires respondent to cease and desist from the unfair labor practices found and from in any other manner interfering with, restraining, or coercing its employees in the exercise of their rights under the Act. Affirmatively, the order requires respondent to recognize and bargain with the union upon request, and to embody any understanding that is reached in a signed contract. Also respondent is required to of-

---

1. The union referred to in this opinion is the Retail Clerks International Association, AFL–CIO. The activities here concern Local 483 of that union.

fer Maxine Chapman reinstatement to make her whole for any loss of earnings suffered as a result of the discrimination against her, with interest, and to post appropriate notices.

Respondent resists the enforcement of the order contending that upon the record as a whole there was not substantial evidence to sustain the trial examiner's findings, and that because of the bias shown by the trial examiner respondent did not receive a fair hearing in violation of its constitutional right to due process of law.

The following are the facts which are relevant to the issues of this appeal. Respondent is a Nebraska corporation which maintains, among other stores, a store located in Fremont, Nebraska, known as Shopper's Fair. This case involves respondent's activities in connection with the employees of the Fremont store. It is agreed by both parties that within the meaning of the Act: respondent is an employer engaged in commerce; that the union is a labor organization; and that the unit that the union is seeking to represent is an appropriate bargaining unit.

On May 25, 1964, a group of respondent's employees attended a union organizational meeting held at the home of one of the employees. At this meeting Edwin Arnold, a union representative, spoke to the group and solicited signatures on authorization cards. These cards, when signed by the employee, authorized the union to act as bargaining agent for the employee. Several cards were signed at the meeting. During the next two days Maxine Chapman, one of the employees, talked to several other employees about the advantages of joining the union and she obtained signed authorization cards from two of these employees. By May 27, 1964, the union had obtained 14 signed authorization cards.[2] That morning Arnold called on respondent's president, Samuel Goodman, at the latter's office in Omaha, Nebraska.

Arnold told Goodman that he represented the union and was there to request that the union be recognized as the collective bargaining representative of the employees of the Shopper's Fair store. Arnold stated that the union represented a majority of the employees of the store. Goodman indicated his lack of knowledge of labor-management matters and asked for an explanation. Arnold showed him a blank authorization card and explained that the union had obtained such cards from a majority of the employees of the store, and that the authenticity of these cards could be checked by a neutral party—and, in fact, Arnold requested that this be done. He explained that the union could also be recognized through a representation election conducted by the National Labor Relations Board, but repeated his request for a card check. Mr. Goodman said that he still did not understand the procedures and that he would have to confer with an attorney. Arnold asked Goodman to have his attorney "contact" him at the union's office, and then he left. On the following day, May 28, in a letter mailed to Mr. Goodman, Arnold again requested that a card check be made and the union be recognized.

On May 27, after his meeting with Arnold, Goodman retained Irvin C. Levin, counsel for respondent in this proceeding, and together they went to the Fremont store. Levin had a short conversation with one of the employees in which he sought to find out whether or not there was any union activity in the store. Later both men conversed with James Morris, the manager of the store, in regard to such activity.

The next day, May 28, employee Maxine Chapman was discharged by James Morris.

On May 29, Arnold telephoned Morris to request the reinstatement of Mrs. Chapman but Morris refused to do so. On the same day, Arnold had a tele-

---

2. It was stipulated that there were either 22 or 23 employees in the unit, depending upon whether or not one employee was a supervisor.

phone conversation with Levin, in the course of which he requested recognition of the union. He stated that the union represented a majority of the employees, and when Levin inquired how the company could be certain of the union's majority, Arnold said he was willing to have a check made of the union's authorization cards. In the course of the conversation Arnold objected to the discharge of Mrs. Chapman, and Levin said he did not think anything could be done about it but that he would check into it and he suggested a meeting with Arnold the following week.

On June 1, 1964, four days after Mrs. Chapman's discharge, Kathleen Delaney was hired and began working in the department in which Mrs. Chapman had been employed. Also on June 1, Levin and Arnold met in Levin's office in Omaha. Again Arnold requested that the union be recognized and asked for a card check. Levin said that the company would prefer to go to an election so that it would have time to talk to its employees. (Other aspects of this conversation will be discussed later in this opinion.) They decided that another meeing was necessary and set it for June 3.

On the evening of June 2, 1964, Levin addressed a meeting of the store employees for about twenty or twenty-five minutes. In this speech Levin informed the employees of their rights and responsibilities concerning a union election, and stated that he thought that the store could get along without a union since there was such a small number of employees and there was "easy contact" between the employees and employer. After the meeting, Levin had an informal conversation with some of the employees. The subject of this conversation will be discussed below.

On June 3, Arnold and Levin had a telephone conversation in which Levin told Arnold that the company had held a meeting of its employees, that he felt that the employees had not made up their minds about the union and he thought

an election was in order. Arnold then stated that unless the company was willing to recognize the union there was no purpose in any further meetings. Therefore they did not meet that day as planned. Subsequently, the union again requested recognition by letter dated June 4, 1964, to which no answer was given.

On June 18, 1964, the union filed charges with the Board that respondent unlawfully refused to recognize and bargain with it, together with the other claimed violations of the Act which have been set out above. Other violations were also charged which are not at issue here. The Board issued the complaint in this action and a hearing was held before a trial examiner on September 22, 1964. The examiner issued his decision January 28, 1965, and on April 13, 1965, the Board adopted the findings and conclusions of the examiner and issued the order which it is seeking to have enforced in this action.

Section 10(e) of the Act, 29 U.S.C.A. § 160(e) provides that the "findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." In interpreting this language in Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456, the Supreme Court said:

"The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. * * * Nor was it intended to negative the function of the Labor Board as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect. Nor does it mean that even as to matters not requiring expertise a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been

before it de novo. * * * a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view."

This court in N.L.R.B. v. Morrison Cafeteria Co. of Little Rock, Inc., 311 F.2d 534, 538 (8th Cir. 1963), said:

"The rule in this Circuit is that 'the question of credibility of witnesses and the weight to be given their testimony' in labor cases is primarily one for determination by the trier of facts. (citations omitted) This Court is not the place where that question can be resolved, unless it is shocking to our conscience."

With these standards for our review in mind, the court now looks to the issues raised by the contentions of the parties in this proceeding.

## BIAS OF THE EXAMINER

■ At the outset the court's attention is drawn to respondent's contention that it did not receive a fair hearing because of the bias of the examiner. Respondent points to the exclusion of certain evidence, the limitation of certain testimony, and the manner of the examiner's questioning as evidence of the examiner's bias and contends that the bias was to such an extent that respondent was denied a fair hearing in violation of its constitutional right to due process. This court has examined the record in some detail and we find that this contention is unsubstantiated. Although there were some instances where the examiner tended to take over the examination of the witness, we find no undue bias in the manner in which the examiner conducted the hearing. The fact that of eight findings of the examiner three were agreed upon by both parties, three were in favor of the Board, and two were in favor of respondent, is at least some indication of the absence of bias. In Bituminous Material

& Supply Co. v. N.L.R.B., 281 F.2d 365, 372 (8th Cir. 1960), this court said, "But even the unanimity of rulings [for the Board] is not necessarily indicative of bias." Certainly the situation presented in this case does not require reversal of the examiner because of undue bias. See Cupples Co. Manufacturers v. N.L.R.B., 106 F.2d 100 (8th Cir. 1939); Coca-Cola Bottling Co. of St. Louis v. N.L.R.B., 195 F.2d 955 (8th Cir. 1952); N.L.R.B. v. Gallup American Coal Co., 131 F.2d 665 (10th Cir. 1942).

## DISCHARGE OF MAXINE CHAPMAN

■ Before discussing the discharge involved in this case perhaps we should state some principles which are followed in any unlawful discharge action. The court is aware: (1) that the mere synchronism of the discharge and the employee's union activities without more will not establish a discriminatory motive for the discharge, N.L.R.B. v. Covington Motor Company, 344 F.2d 136 (4th Cir. 1965); (2) that the existence of a non-prohibited reason for discharge does not negate a violation of the Act if the discharge is actually for a different and prohibited reason, N.L.R.B. v. Solo Cup Company, 237 F.2d 521, 525 (8th Cir. 1956); (3) that an unlawful purpose for the discharge is not lightly to be inferred, N.L.R.B. v. McGahey, 233 F.2d 406, 413 (5th Cir. 1956); (4) however, a violation may be proved by circumstantial evidence, National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 602, 61 S.Ct. 358, 85 L.Ed. 368; (5) that although a general bias or hostility toward the union does not supply the element of purpose, they are proper and highly significant factors for Board evaluation in determining motive, N.L.R.B. v. Dan River Mills, Incorporated, 274 F.2d 381, 384 (5th Cir. 1960); and (6) that the burden of proving violations of the Act is on the General Counsel, Local No. 3, etc. v. N.L.R.B., 210 F.2d 325, 328–329 (8th Cir. 1954), certiorari denied Local No. 3, etc. v. Wilson & Co., 348 U.S. 822, 75 S.Ct. 36, 99 L.Ed. 648.

■ The evidence in this case consists largely of circumstantial evidence and inferences drawn from such evidence. This is not unusual. As we said in N.L.R.B. v. Melrose Processing Co., 351 F.2d 693, 698 (8th Cir. 1965):

"It would indeed be the unusual case in which the link between the discharge and the union activity could be supplied exclusively by direct evidence. Intent is subjective and in many cases the discrimination can be proven only by the use of circumstantial evidence. Furthermore, in analyzing the evidence, circumstantial or direct, the Board is free to draw any reasonable inferences."

Keeping in mind that questions of credibility are for the Board to determine, N.L.R.B. v. Morrison Cafeteria Co. of Little Rock, Inc., supra, we now examine the evidence relied upon by the Board in concluding that respondent violated § 8(a) (3) and (1) of the Act.

For two days following the union organizational meeting of May 25, 1964, Maxine Chapman solicited other employees' signatures on union authorization cards, signed such a card herself, and talked to several of the employees about the advantages of a union. Although her efforts were not exceptional or outstanding, it was established that she was the chief protagonist for the union among the employees. This activity took place during coffee breaks and before and after working hours both on and off the premises where the store manager and other supervisory personnel worked. There was no evidence to show that Mrs. Chapman's actions were done secretly or in a clandestine manner. On May 27, respondent was notified of the union's request for recognition. Mr. Goodman and Mr. Levin came to the store that same day and questioned one employee about union activities in the store. They also had a conversation with Mr. Morris, the store manager. The next day Mrs. Chapman was discharged by Morris. At the time of her discharge Mrs. Chapman ranked fifth in seniority among the clerks at the store and had been employed there for about three years. According to her credited testimony, she had had some trouble with a previous manager but had never been reprimanded about her work nor warned of a possible discharge.

The Board took these facts, plus (1) the lack of any adequate explanation for the discharge from the respondent, (2) the fact the respondent continually refused to recognize the union (more fully discussed hereafter), and (3) respondent's antipathy toward the union manifested by Levin's June 2 speech to the employees, and concluded that respondent knew of Mrs. Chapman's union activities and discharged her because of them.

Respondent contends first, that it had no knowledge of Mrs. Chapman's union activity and therefore could not have discharged her for that reason, and second, that unsatisfactory work performance was the reason for her discharge. To support these contentions respondent relies primarily upon the testimony of the store manager Morris and Mrs. Elsie Greenwood, an employee of respondent. The thrust of their testimony was that Mrs. Chapman was constantly away from her assigned post in the store and had often displayed a poor attitude toward superiors. The examiner considered Morris's testimony vague and evasive and did not credit it. Mrs. Greenwood testified that she had seen Mrs. Chapman away from her post several times but that even though she (Mrs. Greenwood) had been acting manager for a short while, she had never said anything to Mrs. Chapman about it. In the face of all the other evidence the Board is not compelled to accept respondent's bald denial of knowledge of Mrs. Chapman's activities and the unlawful purpose for her discharge. "The Board, not the court, determines the credibility of the witnesses." (citations omitted) Elastic Stop Nut Corp. v. N.L.R.B., 142 F.2d 371, 379 (8th Cir. 1944).

■ Another factor which the Board considered which detracts from respondent's contentions is that on different

occasions respondent gave different reasons for the discharge. According to the credited testimony of Mrs. Chapman, when Morris told her she was being discharged:

> "He said, 'I am going to have to let you go, Maxine. They said the department isn't making any money and I have to cut down someplace and I have to start here.' He said, 'It isn't because of your work.'"

Arnold testified that when he talked to Morris on the telephone, Morris told him that he was only following orders from Goodman when he discharged Mrs. Chapman. In the report to the Nebraska Division of Employment respondent listed economy and poor work performance as reasons for the discharge. Finally, at the hearing respondent claimed that leaving her post and poor attitude were the reasons for her discharge. We agree with the examiner that this does weaken respondent's contention.

> "When an employer shifts position several times in explaining why an employee has been fired, his own case is weakened, and the Board's conclusion that the true reason was for union activity is correspondingly strengthened." N.L.R.B. v. Georgia Rug Mill, 308 F.2d 89, 91 (5th Cir. 1962).

Added to this was the fact that although on two occasions respondent cited economy as one reason for the discharge, four days after the discharge it hired another employee to work in Mrs. Chapman's department.

 We find that the Board had substantial evidence to support its conclusion that respondent violated § 8(a) (3) and (1) of the Act.

### THE § 8(a) (1) VIOLATION

 Section 8(a) (1) of the Act as found in 29 U.S.C.A. § 158(a) (1) provides that "It shall be an unfair labor practice for an employer (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." (Section 7 of the Act) When a statement of an employer or his representatives is alleged to be in violation of this section of the Act, § 8(c) must also be considered. Section 8(c) provides that:

> "The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

For a statement to be a violation of § 8(a) (1) it must not only fall within the meaning of § 8(a) (1) but also without the protection of § 8(c). The statement involved in the instant case was concluded by the examiner to be a promise of economic benefits which did interfere with, restrain, and coerce respondent's employees and therefore violated § 8(a) (1) of the Act. The evidence supporting this conclusion is as follows:

The alleged violation occurred during the course of a conversation between Levin and three women employees of respondent. The conversation took place after Levin's speech at the June 2 meeting when a few of those attending remained to talk for a while. Two of the three women testified as to the content of the conversation. Marjorie Story was one of these witnesses and after it was established that she was an employee and was at the meeting she testified as follows:

> "Q. (By Mr. McCalla) All right, what did you do after the meeting?
>
> "A. After the meeting, I started out towards the front of the store and stopped for a few minutes to visit with Mr. Levin and Mrs. Clausen and Mrs. Searle, and at that time Mr. Levin mentioned the fact that when you have unions, it sometimes results in strikes. Consequently, your sales go down and that could mean employment, decrease in employees."

There was no further testimony from her concerning the contents of the con-

versation. [The remarks of Levin concerning strikes mentioned by Mrs. Story and repeated in Mrs. Searle's testimony were held by the Board to be within the protection of § 8(c) of the Act and are not part of the alleged unlawful statements.] Mrs. Marie Searle was then called, and testified as follows:

"Q. (By Mr. McCalla) What did you do after this meeting was over?

"A. I stayed in the back room for a few moments and then went to the front and Mr. Levin was talking to Mrs. Claussen and he offered to shake our hands, and we stopped. And he told us, we got into a conversation and he mentioned that it stands to reason if the union comes in, there may be strikes.

"TRIAL EXAMINER: It stands to reason what?

"THE WITNESS: If the union comes in, there may be strikes.

"A. (continuing) And if there are strikes, that business would decrease and they would have to lay off half the employees. And then he said he personally could see several things wrong or several things that could be improved within the store, such as vacation benefits and insurance, I think he said insurance, I am not sure. He said he personally, he wasn't speaking for the store, this was his own personal opinion."

This was all the evidence concerning this violation. From this the examiner concluded that "this statement of opinion constituted an unlawful promise of benefits within the purview of section 8(a) (1) of the Act." Taking into account the circumstances surrounding the statement and the context in which it was made the examiner concluded that the statement:

" * * * was calculated, and did tend, to convey to the employees the belief that if they would be willing to forego having union representation, he would, in his capacity as labor counsel for respondent, attempt to persuade respondent to grant them the benefits

to which he indicated he thought they were entitled."

The Board, in its argument to the court seeking to uphold this conclusion, asks the court to find that the employees inferred that Levin was speaking for the management even though he stated that this was his own opinion and he was not speaking for the store, or in the alternative, that Levin would use his influence to persuade the management to grant such benefits. The Board then argues that the statement was an implied promise and draws the inference that it was made with the intention of coercing or restraining the employees.

We think that this strains the rule of substantial evidence beyond its limits and we cannot uphold the Board's conclusion. This is not to say that the same statement made in other circumstances might not be a violation of the Act. Nor do we say that a representative of an employer who ostentatiously states that his statement is his own opinion will necessarily be protected. We are merely saying that the burden of proving violations of the Act is upon the General Counsel, Local No. 3, etc. v. Wilson & Co., supra, and he has failed to carry that burden here. We cannot affirm a claimed § 8(a) (1) violation on such meager evidence. Therefore, this portion of the Board's order will not be enforced.

## REFUSAL TO RECOGNIZE AND BARGAIN

As has been stated before, on May 27, 1964, Arnold, the union representative, presented himself to respondent's president and asserted that his union represented a majority of respondent's employees and requested that the union be recognized and bargained with. He offered to authenticate his majority representation by suggesting a check of the union's authorization cards. Although there is some question as to the size of the majority, there is no real contention that the union did not, in fact, represent a majority of the employees. It is also undisputed that the union was not recog-

nized either at this time or when Arnold requested recognition in a letter of May 28, 1964, by phone on May 29, in person on June 1, and again by phone on June 3.

It is well settled that when a union has obtained authorization cards signed by a majority of the employees in an appropriate bargaining unit, the employer violates § 8(a) (5) of the Act if he refuses to recognize and bargain with the union. The employer is protected from this charge if, and only if, he has a good faith doubt as to the union's majority status. This good faith doubt must have some reasonable basis and is not established merely by the employer's assertion of doubt of the majority. See Colson Corp. v. N.L.R.B., 347 F.2d 128 (8th Cir. 1965); N.L.R.B. v. Decker, 296 F.2d 338 (8th Cir. 1961); Jas. E. Matthews & Co. v. N.L.R.B., 354 F.2d 432 (8th Cir. 1966). Therefore the real issue before the examiner was whether or not the respondent had a *good faith* doubt concerning the union's majority.

The Board concluded that respondent's refusal to recognize the Union was not based upon a good faith doubt about its majority status, but rather upon a desire to gain time in which to undermine that status. This conclusion was based on the following facts: (1) The union did in fact represent a majority of respondent's employees. (2) In all the conversations and dealings between the union and respondent there was no indication that a doubt existed except for a general statement of Levin's that "people will sign anything." (3) on the other hand, there were several statements tending to show that respondent was stalling for time. Mr. Arnold testified that at the June 1 meeting between Levin and Arnold, Levin stated that the company preferred to go to an election so the company would have more time to talk to the employees. He also asked what the union was hoping to get for the employees and told Arnold that "we don't want to buy a pig in the poke." In a telephone conversation on June 3 Levin told Arnold that the company had held a meeting Tuesday, June 2, with the store employees, and from this meeting he felt that the employees had not made up their minds about the union. He said he felt the company should go to an election as this would give the company more time to talk to the employees. Later testimony showed that at the meeting no one talked or expressed their opinion except Levin. (4) On the day after being notified of the union's majority, respondent discharged the union's prime protagonist among the employees because of her union activities. (5) Five days after the union's request for recognition Levin spoke to the employees and indicated respondent's opposition to the union.

This court finds that these facts, together with the reasonable inferences to be drawn from them, substantially support the Board's finding.

Respondent, of course, contends that it had a reasonable basis for a good faith doubt as to the union's majority. As one of its reasons respondent cites the slimness of the majority which was proven at the hearing. In effect it is saying that the fact that the majority was so small shows that it was reasonable to doubt its existence. However, there was no evidence in the record that respondent had any knowledge of the number of employees who had signed cards prior to the hearing; in fact, the opposite is indicated by respondent's counsel's questions to Arnold concerning the majority.

As other evidence of the reasonableness of its doubt, respondent points to the testimony of Mrs. Helen White and Mrs. Judith Novotny and contends that their testimony shows that they signed authorization cards as a result of misrepresentation or coercion, thereby casting a disparaging light on the authenticity of the union's majority. This argument is not persuasive for two reasons. First, the Board held that the women's signatures were not obtained by misrepresentation or coercion and that they understood the purpose of the cards they were signing. Second, while it is con-

ceded that a good faith doubt may be based on a belief that the union has obtained its authorization cards by misrepresentation or coercion, there is nothing in the record to show that respondent had any knowledge of the circumstances surrounding the signing of these women's cards during the time that recognition of the union was being sought.

After examining the evidence shown by this record, including that which may be said to detract from the Board's findings, we hold that the Board's conclusion that respondent violated § 8(a)(5) of the Act by refusing to recognize and bargain with the union is supported by substantial evidence.

We therefore hold that the Board's order of April 13, 1965, shall be enforced as modified by this opinion.