NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

The SINCLAIR COMPANY, Respondent.

No. 7069.

United States Court of Appeals
First Circuit.

July 3, 1968.

Peter M. Giesey, Washington, D. C., Attorney, with whom Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and William Wachter and Nancy M. Sherman, Washington, D. C., Attorneys, were on brief, for petitioner.

Edward J. Simerka, Cleveland, Ohio, with whom Stanley, Smoyer & Schwartz, Cleveland, Ohio, was on brief, for respondent.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

This is a petition for enforcement of a Labor Board order issued against the respondent, The Sinclair Company. The order is based on findings that the company interfered with the organizational rights of its employees by threatening that unionization would cause them to lose their jobs and also that the company refused to bargain with the union as the representative of its employees in violation of § 8(a) (1) and (5) of the National Labor Relations Act.[1] The basic question is whether on the record as a whole these findings are supported by substantial evidence. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

The respondent company, whose main plant is in Holyoke, Massachusetts, was founded in 1925. It was acquired by Lindsay Wire Weaving Company of Cleveland, Ohio, in 1964 and is now a division of Lindsay. David Sinclair, son of the founder and the central figure in this litigation, continued as president under the new regime.

Briefly, the company's labor relations background is as follows. From 1933 to 1952 its journeymen and apprentice wire weavers were represented by a union known as the American Wire Weavers Protective Association. (A.W.W.P.A.) This relationship terminated in 1952 after A.W.W.P.A. called a strike that lasted some thirteen weeks. From 1952 to 1965 the employees were not represented by any union.

Early in July 1965 [2] the Teamsters Union began organizing the employees.[3] By

---

1. Accordingly, the Board ordered the company to cease and desist from its unfair labor practices, to bargain upon request, with the union as the authorized representative of its wire weavers, and to post appropriate notices.

2. All dates hereinafter mentioned, unless otherwise indicated, refer to the year 1965.

3. Sometime between 1952 and 1965 A.W.W.P.A. merged or affiliated with the Teamsters Union.

letter dated September 20, Teamsters Local 404 notified the company that it represented a majority of its journeymen wire weavers and apprentices; requested that the company bargain with it and made the usual offer to submit the signed authorization cards for authentication.[4] The company refused to recognize the union. Local 404 filed a representation petition. The parties stipulated to a Board conducted election among the wire weavers and said election was held on December 9. With a total of thirteen ballots cast the union lost by a vote of seven to six. Thereupon it petitioned the Board to set aside the election and filed the unfair labor practice charges here involved. Adopting the findings of the trial examiner, the Board set aside the election and entered an unfair labor practice order. The issue revolves around the pre-election conduct of the company's president.

In July when Sinclair learned of the union's efforts he immediately addressed the employees in separate groups, with the view to dissuading them from joining the union.[5] On November 2, and again on November 5, he sent them letters vigorously opposing the union.[6]

We now come to the period directly involved in the Board's findings.[7] Two or three weeks before the scheduled election, Sinclair embarked upon an intensive campaign to induce the wire weavers to reject the union. His first message consisted of a letter or pamphlet illustrated with drawings and entitled "Who Would Buy The Groceries . . . While You Walk The Teamsters Picket Line?" Its dominant theme was "Do You Want Another 13-Week Strike?"[8] Among other things, the pamphlet emphasized that the union has but one weapon—a strike; that the Teamsters Union is a "strike happy outfit"; that it can again close the wire weaving department and the entire plant by a strike and that only the striking employees and the company, not the union organizers, would be hurt. On November 30 he followed up with a similar letter to the wire weavers reminding them again of the disastrous effects of the long 1952 strike on both the company and the employees. He also stated that "a strike can still close

4. At that time the union had authorization cards from eleven of the company's fourteen journeymen wire weavers. There were no apprentices.

5. He reminded them, particularly the wire weavers, that the last union had a long strike that almost put the company out of business, and that the company has been on "thin ice" ever since. Sinclair also told them that "A strike could lead to the closing of the plant." Continuing in this vein he indicated that wire weaving offered only limited job opportunities and in view of their age and lack of education, new jobs would be hard to get. He then proceeded to down-grade the Teamsters Union and concluded by saying that in merging with Lindsay the company had been given a second chance but that Lindsay didn't need the company's wire cloth production and in the event of a strike could satisfy its needs elsewhere.

6. In the first of these letters Sinclair indicated that employees who signed cards could still vote against the union. He also told them that nothing the Teamsters or any other union could offer would increase their job security and ended with the warning that the company was still on "thin ice" and that it didn't make sense for the company to meet unreasonable union demands which could result in further losses "and eventually the closing of the plant."

The November 5 letter reviewed the poor earnings history of the company; stated that the new ownership was interested in "profits and not pressure"; that the Teamsters Union can only deliver pressure—the threat of a strike; that the new management had no ties in Holyoke or Massachusetts and he "did not believe the threat of a strike will cause the new owners any loss of sleep" but "a long strike would be bad for me because I would like to continue to live in Holyoke."

7. While the Board took into account the company's prior conduct as background, its findings were based on the company's activities during the period from November 8, when the instant representation petition was filed, and December 9, the date the election was held.

8. A majority of the wire weavers had participated in the 1952 strike.

the Holyoke plant." The very next day (December 1) Sinclair sent the wire weavers a third communication containing more of the same, listing the misdeeds of several top Teamster officials, denouncing the union and its tactics and urging the wire weavers to vote "No" in the election.

Next came a four page leaflet dated December 7, entitled "Let's Look At The Record" and illustrated with a cartoon. This leaflet purported to be an obituary of the companies in the Holyoke-Springfield area that allegedly had fallen victim to union demands and had gone out of business, eliminating some 3500 jobs in the area. The leaflet concluded by suggesting that the wire weavers drive past these plants before making their decision to vote for the union. The day before the election another handbill entitled "Vote Right—Avoid Strikes" was passed out by the company. In graphic form it set out several supposedly beneficial effects of voting "No" in the election and ended with a scathing attack on high Teamsters officials and the union itself. That same afternoon the president personally addressed the wire weavers in a final appeal to reject the union. Again he mentioned union corruption and reminded his hearers of the company's precarious financial condition. In his closing plea, Sinclair again told the wire weavers of the unlikelihood of their obtaining other employment because of their age and limited education. It also appears that Sinclair talked personally to about ten of the fourteen wire weavers between July and December 9 in an effort to persuade them not to vote for the union.

■ An employer violates § 8(a) (1) of the Act if in communicating with his employees during a union organizational campaign preceding an election he makes promises of benefits, threats of loss, or reprisal for their vote. Wausau Steel Corp. v. N.L.R.B., 377 F.2d 369, 372 (7th Cir. 1967). The respondent defends on the ground that in making the pre-election statements above mentioned it was merely informing its employees of the facts; that it made no untrue statements; that these statements considered separately are lawful and this being so, the combination of them could not result in illegal conduct. The problem is not as simple as that. Conveyance of the employer's belief, even though sincere, that unionization will or may result in the closing of the plant is not a statement of fact unless, which is most improbable, the eventuality of closing is capable of proof. The employer's prediction must be in terms of demonstrable "economic consequences." Surprenant Mfg. Co. v. N.L.R.B., 341 F.2d 756, 761 (6th Cir. 1965). Moreover, in considering coercive effect the test is the totality of the circumstances. N.L.R.B. v. Kolmar Laboratories, Inc., 387 F.2d 833, 837 (7th Cir. 1967). Daniel Construction Co. v. N.L.R.B., 341 F.2d 805 (4th Cir.), cert. denied, 382 U.S. 831, 86 S.Ct. 70, 15 L.Ed.2d 75 (1965); N.L.R.B. v. Wagner Iron Works, 220 F.2d 126, 139 (7th Cir. 1955), cert. denied, 350 U.S. 981, 76 S.Ct. 466, 100 L.Ed 850 (1956).

■ As stated in N.L.R.B. v. Kropp Forge Co., 178 F.2d 822, 828–829 (7th Cir. 1949), cert. denied, 340 U.S. 810, 71 S.Ct. 36, 95 L.Ed. 595 (1950):

"A statement * * * might seem * * * perfectly innocent * * *, including neither a threat nor a promise. But, when the same statement is made by an employer to his employees, and we consider the relation of the parties, the surrounding circumstances, related statements and events and the background of the employer's actions, we may find that the statement is a part of a general pattern which discloses action by the employer so coercive as to entirely destroy his employees' freedom of choice and action.

* * * If, when so considered, such statements form a part of a general pattern or course of conduct which constitutes coercion and deprives the employees of their free choice guaranteed by Section 7, such statements must still be considered as a basis for a finding of unfair labor practice."

It is evident that Sinclair's communications were designed to impress upon the wire weavers (1) that the 1952 strike had left the company in a state of continuing financial difficulty; (2) that the union's only weapon is a strike and the Teamsters Union is a "strike happy outfit"; (3) that another strike could, and in his opinion would, close the plant and (4) that it would be difficult for the wire weavers because of their age and limited education to secure other employment. Whether an employer has used language that is coercive in its effect is a question essentially for the specialized experience of the Board. Daniel Construction Co. v. N.L.R.B., supra. The Board found

> "that the series of letters, pamphlets, leaflets, and speeches from and by President Sinclair, hereinabove described, taken together and considered as a whole, reasonably tended to convey to the employees the belief or impression that selection of the Union in the forthcoming election could lead Respondent to close its plant, or to the transfer of the weaving production, with the resultant loss of jobs to the wire weavers."

The Board also found that the aforesaid conduct interfered with the employees' exercise of a free and untrammeled choice in the election.[9]

On the record before us we think there is substantial evidence to support these findings. Also, it is clear that under the circumstances the company must take the responsibility for the pre-election conduct of its president. Daniel Construction Co. v. N.L.R.B., supra. In N.L.R.B. v. Freeport Marble & Tile Co., 367 F.2d 371 (1st Cir. 1966), we held that respondent having made threats of economic consequences to its business in case of unionization has the burden of proving justification. The company has not met its burden here.

Also, we think the Board's finding that in refusing to bargain with the union the respondent violated § 8(a) (5) and (1) of the Act is supported by substantial evidence. The company contends that it refused to recognize and bargain with the union for the following reasons: (1) that it had a good faith doubt that Teamsters Local 404 represented an uncoerced majority of the weaving department employees; (2) that authorization cards are an unreliable means for determining the union's majority status, and (3) that it expected there would be questions concerning the appropriate bargaining unit which should be determined by the Board. In its consent to the election respondent agreed that the wire weavers group constituted an appropriate unit. Furthermore, the company does not dispute that on September 20 when Local 404 requested recognition for this group it had valid authorization cards for at least ten of the fourteen wire weavers. A good faith doubt is not established merely by assertion but must have some reasonable or rational basis in fact. N.L.R.B. v. Superior Sales, Inc., 366 F.2d 229, 237 (8th Cir. 1966). Here the company made no attempt to discover what the actual card situation was when the union requested recognition for the wire workers unit. We therefore conclude that the company made no real showing of good faith doubt either as to the union's majority status or as to the appropriateness of the bargaining unit. Instead of recognizing the union on the basis of its admitted card majority the company insisted on an election—as the Board found, in order to gain time in which to dissipate the union's majority. In view of the company's unlawful interference with the employees' rights during the pre-election campaign we think the Board acted within its discretion in setting aside the election and in ordering the company to bargain. N.L.R.B. v. Southbridge Sheet Metal Works, Inc., 380 F.2d 851 (1st Cir. 1967).

Actually what the company is contending here is that signed authorization cards are so unreliable that it has

9. See n. 7.

a right to reject a request for recognition based on them and insist upon an election. We have already rejected this proposition in this circuit. N.L.R.B. v. Whitelight Products, 298 F.2d 12 (1st Cir.), cert. denied, 369 U.S. 887, 82 S.Ct. 1161, 8 L.Ed.2d 288 (1962). See N.L.R.B. v. Southbridge Sheet Metal Works, Inc., supra. The representation status of a union may be shown by means other than an election. United Mine Workers v. Arkansas Oak Flooring Co., 351 U.S. 62, 71–72, 76 S.Ct. 559, 100 L.Ed. 941 (1956).

In the instant case there is undisputed evidence of the union's majority status long prior to the election. It is reasonable to conclude that this status was dissipated by the company's unlawful interference with the employees' Section 7 rights, thus tainting the December 9 election. In these circumstances we think the Board was warranted in entering a bargaining order rather than ordering a new election. Wausau Steel Corp. v. N.L.R.B., supra.

Finally, we see no merit in the company's contention that the Board's order is invalid in that it fails to specify the conduct it purports to proscribe.

The order will be enforced.