440 F.2d 876
 76 L.R.R.M. (BNA) 2969, 65 Lab.Cas. P 11,627
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
HUNTER OUTDOOR PRODUCTS, INC., Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
LOCAL 29, RETAIL, WHOLESALE AND DEPARTMENT STORE UNION,
AFL-CIO, Respondent, and Hunter Outdoor Products,
Inc., Intervenor.
 Nos. 7755, 7756.
 United States Court of Appeals, First Circuit.
 March 31, 1971.
 
 Allison W. Brown, Jr., Washington, D.C., Attorney, with whom Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Lawrence H. Pelofsky, Washington, D.C., Attorney, were on brief, for petitioner.
 John M. Stevens, Jr., Boston, Mass., with whom Laurence S. Fordham, and Foley, Hoag & Eliot, Boston, Mass., were on brief, for Hunter Outdoor Products, Inc., respondent.
 Before ALDRICH, Chief Judge McENTEE and COFFIN, Circuit Judges.
 McENTEE, Circuit Judge.
 
 
 1
 These cases come to us on application for enforcement of Labor Board orders against Hunter Outdoor Products, Inc., and Local 29, Retail, Wholesale and Department Store Union, AFL-CIO (hereinafter, RWD). Hunter has recognized RWD as the exclusive bargaining agent of its employees in North Adams, Massachusetts. Charges were originally brought against both respondents by the International Ladies' Garment Workers' Union, AFL-CIO (hereinafter, ILG), a rival union that has been attempting to organize Hunter's North Adams employees. RWD defaulted in the proceedings before the Board and has not argued before this court. We have allowed Hunter to intervene in No. 7756, the proceeding against RWD, and have consolidated the two cases for joint decision.
 
 
 2
 Hunter is a manufacturer of sleeping bags, tents, and related products. Its principal place of business is Long Island City, New York, where its employees have been represented by RWD for some time. In 1966 and 1967 Hunter purchased two new plants in North Adams. Soon after production had commenced, Joel Pave, RWD's president, began to pressure Joseph Martin, Hunter's vice president, to recognize RWD as the exclusive bargaining representative for the North Adams plants, on the theory that the Long Island City collective bargaining agreement extended to North Adams. Martin initially attempted to 'stall' Pave but eventually allowed him to address the North Adams employees in September 1967. Pave told the employees that RWD represented them, 'whether they liked it or not,' and that all had to join within thirty days or face dismissal. He promised wage increases but threatened to prevent trucks from delivering goods to the plants if RWD was not accepted. The trial examiner found that neither Martin nor any other Hunter representative was aware of Pave's threats and promises.
 
 
 3
 Late in September Pave telephoned Martin to inform him that RWD had obtained authorization cards from a majority of the North Adams employees and requested a meeting to negotiate a contract. Martin refused to bargain. On or about October 1 ILG began organizational activities at the plants and, at an RWD meeting on the evening of October 3, ILG sympathizers began to raise questions about the regularity of RWD's position and requested an election. The next day, October 4, Martin committed the first unfair labor practice attributed to Hunter by the Board. He told employees at one of the plants that, while he did not like unions generally, he preferred RWD as a decidedly 'lesser evil' than ILG; that past experience had taught him that he could not deal with ILG; and that, if ILG became the employees' representative, he would close the plant. He also announced a 'no solicitation' rule which was subsequently applied in a discriminatory manner against ILG.
 
 
 4
 Hunter and RWD then agreed to submit the representation question to arbitration. While it is not entirely clear when this agreement was reached, the trial examiner concluded that it was sometime after October 4. On October 27 the arbitrator ruled that the Long Island City contract did not extend to North Adams but that a comparison of the signatures on RWD's authorization cards with those on Hunter's payroll records revealed that RWD 'represents 209 of the 261 employees in the Company's two factories in North Adams, Massachusetts.' On November 4, Hunter and RWD executed a collective bargaining agreement which included union shop and dues check-off provisions. Several additional unfair labor practices were committed by both respondents during November and the months that followed, and the collective bargaining agreement was generally ignored.
 
 
 5
 The Board ruled that Hunter had violated 8(a)(1), (2), and (3) of the Act by recognizing RWD as collective bargaining representative and by signing and maintaining the collective bargaining agreement at a time when RWD did not represent an uncoerced majority of the employees; also, that RWD had violated 8(b)(1)(A) and (2) of the Act by accepting recognition and by executing the agreement. The Board also found respondents guilty of numerous additional unfair labor practices.[1] It ordered them to cease and desist from these practices and from 'maintaining or giving any force of effect' to the November 4 collective bargaining agreement. Hunter was affirmatively ordered to withdraw recognition from RWD, and both respondents were required to reimburse the employees for dues withheld under the November 4 contract.
 
 
 6
 Hunter argues that it did not commit an unfair labor practice in recognizing RWD, because, so far as it knew, RWD represented an uncoerced majority of the employees when it demanded recognition on September 29. But in International Ladies' Garment Workers' Union v. NLRB,366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961) (Bernhard-Altmann), the Supreme Court held that an employer who recognizes a minority union commits an unfair labor practice notwithstanding a good faith belief on his part that it has majority support. The Court said, 'We find nothing in the statutory language prescribing scienter as an element of the unfair labor practices here involved.' Id. at 739, 81 S.Ct. at 1608.[2] Similarly, an employer commits an unfair labor practice if he recognizes a union which his employees have been coerced to support, even if he has no knowledge of that coercion. NLRB v. Jan Power, Inc., 421 F.2d 1058, 1063 (9th Cir. 1970).
 
 
 7
 Hunter argues that, if it is to be found in violation of the Act on account of alleged coercion by RWD, it should have the opportunity to disprove those allegations. Prior to the hearing before the trial examiner, Hunter and RWD had apparently agreed to divide the responsibility for different aspects of the defense, and Hunter claims that it was totally surprised by RWD's default. It requested continuances three times during the hearing and once in a post-hearing motion in order to prepare rebuttal evidence regarding RWD's actions during September 1967. All these requests were denied. The trial examiner took the position that RWD 'virtually admits it never attained majority status,' a conclusion which is not supported by the record. She also stressed that Hunter had the opportunity to cross-examine all the general counsel's witnesses and that she had offered to subpoena Pave. But a respondent's right to 'full litigation' of alleged unfair labor practices must include the right to call his own witnesses. Cf. NLRB v. H. E. Fletcher Co., 298 F.2d 594, 600 (1st Cir. 1962). However, Hunter has failed to show how it was prejudiced by the denial of a continuance. Almost three years have passed since the hearing before the trial examiner, and Hunter has yet to make any specific suggestions as to what it might expect to be able to show if the case were reopened.[3] NLRB v. Phaostron Instrument & Electronic Co., 344 F.2d 855, 858 (9th Cir. 1965); NLRB v. Somerville Buick, Inc., 194 F.2d 56, 59 (1st Cir. 1952); cf. Megantz v. Ash, 412 F.2d 804, 807 (1st Cir. 1969). See also Consolidated Edison Co. of New York v. NLRB, 305 U.S. 197, 226, 59 S.Ct. 206, 83 L.Ed. 126 (1938).
 
 
 8
 Furthermore, even assuming arguendo that RWD had an uncoerced majority on September 29, Hunter did not accord it recognition until after October 4. Martin's October 4 speech was sufficiently coercive to convert any 'freely-chosen majority representation into a coerced one.' NLRB v. Midtown Service Co., 425 F.2d 665, 668-669 (2d Cir. 1970). Not only the acquisition of majority support but also its maintenance can be 'contaminated by the employer's aid.' IAM, Tool and Die Makers, Local 35 v. NLRB,311 U.S. 72, 79, 61 S.Ct. 83, 85 L.Ed. 50 (1940). Particularly where an employer is aware of organizing efforts by a rival union, it acts at its peril in according hasty recognition when one union claims majority support. Allied Supermarkets, Inc., 169 N.L.R.B. No. 135 (1968).[4]
 
 
 9
 The most prudent course for Hunter under the circumstances would have been to petition for a Board-conducted election pursuant to 9(c) of the Act. But Hunter cites NLRB v. Sinclair Co., 397 F.2d 157 (1st Cir. 1968), aff'd sub nom. NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), for the proposition that a company's request for an election at a time when the company has no good faith doubt regarding the validity of the union's claim to representation can constitute an unfair labor practice. What was condemned in Sinclair, however, was not the request for an election per se but Sinclair's motivation for requesting an election, namely, 'to gain time in which to dissipate the union's majority.' Id., 397 F.2d at 161. Moreover, Sinclair's insistence on an election was accompanied by several additional unfair practices. It is true that under the Joy Silk doctrine an employer could not refuse to bargain unless he had a 'good faith doubt' as to the union's majority status. Joy Silk Mills, Inc., 85 N.L.R.B. 1263 (1949), enforced, 87 U.S.App.D.C. 360, 185 F.2d 732 (1950). But this doctrine has been modified so that 'under the Board's current practice, * * * an employer can insist that a union go to an election, regardless of his subjective motivation, so long as he is not guilty of misconduct.' NLRB v. Gissel Packing Co., supra, 395 U.S. at 594, 609, 89 S.Ct. at 1930; see Aaron Brothers Co., 158 N.L.R.B. 1077 (1966). The line between 'close cooperation' and 'interference with the freedom of choice of the employees' is a delicate one and often difficult to maintain, particularly where rival unions are involved. See NLRB v. Keller Ladders Southern, Inc., 405 F.2d 663, 667 (5th Cir. 1968). The required neutrality can be preserved most effectively by insisting on Board certification.
 
 
 10
 Hunter also makes the argument that (1) it did not know that RWD had used coercive tactics to obtain the authorization cards on which it based its September 29 demand for recognition; (2) it acted reasonably in submitting the cards to arbitration in order to verify the signatures; and (3) once the arbitrator ruled that RWD had a valid majority, Hunter was bound to accord it recognition. The trial examiner found, however, that Hunter did not agree to arbitration until after it had committed unfair labor practices of its own on October 4. Hunter argues that the only reasonable inference from Martin's testimony is that the parties had agreed to arbitration on September 29. But the trial examiner reasoned that, if that were true, Pave and Martin would have made some mention of arbitration in their October 3 and 4 speeches discouraging employee support for ILG.[5] Furthermore, the arbitrator based his decision on 209 cards, but RWD did not have 209 signatures until October 23, which suggests that the matter was not submitted to arbitration until October 23 or shortly before that date. Finally, a finding that the arbitration agreement came after October 4 is consistent with Martin's testimony that all through this period he tried to 'stall' Pave 'to death.'
 
 
 11
 Hunter cites the policy favoring arbitration of labor disputes in support of its decision to submit the representation question to arbitration. See United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). We note that it is conceivable for a company to enter into an arbitration agreement that will obligate it to recognize a minority union. See Sovern, Section 301 and the Primary Jurisdiction of the NLRB, 76 Harv.L.Rev. 529, 540-543 (1963). But the fact that a dispute has been settled privately by arbitration does not preclude the Board from reconsidering the issues in a subsequent unfair labor practice proceeding. 'Should the Board disagree with the arbiter, * * * the Board's ruling would, of course, take precedence.' Carey v. Westinghouse Electric Corp., 375 U.S. 261, 271-272, 84 S.Ct. 401, 409, 11 L.Ed.2d 320 (1964); ILA, Local 854 v. W. L. Richeson & Sons, Inc., 57 CCH Lab. Cas. P12,568 (E.D.La.1968). The National Labor Relations Act guarantees employees 'complete and unfettered freedom of choice' in the selection of a collective bargaining representative. NLRB v. Link-Belt Co., 311 U.S. 584, 588, 61 S.Ct. 358, 361, 85 L.Ed. 368 (1941). It would be anomalous if an employer could abrogate that right by contracting with a minority union to submit to binding arbitration. Although the NLRB has adopted a policy of deferring to an arbitration award, this policy applies only 'if to do so will serve the fundamental aims of the Act.' International Harvester Co., 138 N.L.R.B. 923 (1962), enforced sub nom. Ramsey v. NLRB, 327 F.2d 784 (7th Cir.), cert. denied, 377 U.S. 1003, 84 S.Ct. 1938, 12 L.Ed.2d 1052 (1964). As the trial examiner pointed out, if Hunter genuinely wanted the question of representation to be arbitrated fairly, it should have instructed the arbitrator to 'look into the circumstances under which the cards were solicited and signed' and to inquire whether any cards were invalid on the ground that the signer had signed cards for more than one union.
 
 
 12
 The orders of the Board will be enforced.
 
 
 
 [1]
 The Board ruled:
 'Since on or about October 4, 1967, Respondent Hunter has engaged in unfair labor practices in violation of Section 8(a)(2) and (1) * * * (by promulgating and applying a no-solicitation rule in a discriminatory manner); by persuading an employee to retain her position as a union shop steward; by threatening employees with deprivation of wage increases, holiday pay and other benefits if they did not join RWD; (and by) interrogating an employee concerning employee activity on behalf of ILG and concerning her refusal to join RWD.'
 'Since on or about October 4, 1967, Respondent Hunter has engaged in unfair labor practices in violation of Section 8(a)(1) by threatening closure of Hunter's North Adams plants if the employees chose to be represented by ILG; by interrogating employees concerning employee activities on behalf of ILG; by keeping employees' union activities under surveillance and creating among the employees the impression of such surveillance; by telling employees not to accept ILG literature; and by physically assaulting an ILG representative in view of employees.'
 It ruled that RWD had violated 8(b)(1)(A) by using coercive tactics to obtain employee signatures on its authorization cards.
 
 
 [2]
 The Court suggested that there was no need for a requirement of scienter in Bernhard-Altmann because the remedy imposed by the Board 'places no particular hardship on the employer or the union.' Id. As in Bernhard-Altmann, the order that Hunter Withhold recognition from the union, cease giving effect to the collective bargaining agreement, and wait for a Board-conducted election is not punitive but is designed merely to restore the status quo ante. Fibreboard Corp. v. NLRB, 379 U.S. 203, 216, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964)
 
 
 [3]
 Since respondent apparently did not intend to call Pave to deny the statements purported to have been made by him, the evidence of coercion offered by the general counsel would have been very difficult to rebut. As the Board points out, testimony by individual employees that they did not subjectively feel coerced is not considered reliable. NLRB v. Gissel Packing Co., 395 U.S. 575, 608, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). Furthermore, the trial examiner was entitled to infer an overall coercive atmosphere from the testimony of but a few employees. NLRB v. Clement Bros. Co., 407 F.2d 1027 (5th Cir. 1969)
 
 
 [4]
 Hunter argues that it made a reasonable effort to verify RWD's claim to majority support by submitting the issue to arbitration. Cf. Bernhard-Altmann, supra, 366 U.S. at 739-740, 81 S.Ct. 1603. Its efforts were grossly inadequate, however, since the arbitrator was not authorized to inquire into all of the relevant circumstances. See discussion infra
 
 
 [5]
 On October 3 Pave told the employees that the Long Island City contract extended to North Adams and that there would be no election but made no mention of any arbitration agreement. On October 4 Martin told them they did not have to join any union and that he would close the plant if ILG were voted in but made no mention of any arbitration agreement