GENERAL THERMO, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 80–1778.

United States Court of Appeals,
Eighth Circuit.

Submitted June 16, 1981.

Decided Nov. 20, 1981.

Fred G. Groiss (argued), Joseph D. Masterson, Milwaukee, Wis., for General Thermo, Inc.; Quarles & Brady, Milwaukee, Wis., of counsel.

Andrew F. Tranovich (argued), Morton Namrow, Attys., William A. Lubbers, Gen.

Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., for respondent.

Before HEANEY and HENLEY, Circuit Judges, and NICHOL,* Senior District Judge.

HENLEY, Circuit Judge.

General Thermo, Inc. petitions this court to set aside an order of the National Labor Relations Board finding that it engaged in unfair labor practices when its assistant plant manager, Ronald Bohn, asked questions about support for a union and indicated his opposition to it, and when Bohn fired an employee, Richard McMahon. The NLRB cross-petitions for enforcement of its order. This court has jurisdiction pursuant to 29 U.S.C. § 160(e) and (f), the alleged unfair labor practices having taken place in Maquoketa, Iowa, within this circuit.

The Company makes radiators and industrial heat transfer units, and employs about 125 people. McMahon was employed as a radiator assembler from January 20, 1977 until his discharge on September 26, 1978.

1. *Bohn's questions and statements about the Union.*

On August 21, 1978 McMahon and two other employees, Melva Polkinghorn and Clayton Shady, discussed various problems at the plant—safety hazards, disparate wages for women, material shortages, and equipment problems. Polkinghorn suggested that they needed a union, and McMahon and Shady agreed with her. Polkinghorn stated that she knew of some people to contact about forming a union.

Shortly thereafter McMahon made efforts to contact them. He sent his wife to Dubuque, Iowa to discuss union organizing with a UAW representative. McMahon then arranged for an organizational meeting to take place at his house on September

20. The meeting was rescheduled for October 5 (several days after McMahon's discharge) because of a conflict in the UAW representative's schedule. At this meeting only seven or eight authorization cards were collected, and no further meetings have been held.

By the time of the Company picnic on September 9, management was aware that some employee support for a union existed. At the picnic Ronald Bohn, who had only begun working at the Company at the beginning of September, introduced himself to employees and conversed with them. He was asked about his past employment, and he responded that he had worked at Young Radiator (a competitor of General Thermo). In the course of the conversation he mentioned a nine and one-half month strike which had occurred at Young Radiator, and stated that both the company and the employees lost during the strike.

One of the groups Bohn approached included Victor DuBois and Clarence Polkinghorn. After introducing himself, Bohn asked whether they had any complaints about the Company. DuBois replied that some newer employees earned more money than long time employees. Bohn promised to look into it, and then inquired what the people in the group thought of the union. He also indicated that he knew that McMahon and Shady were involved, and had heard that a woman was involved but did not know who she was. Clarence Polkinghorn knew that the woman was his former wife, Melva, and went to get her.

Melva shortly joined the group. Bohn expressed the opinion that employees did not need a union, and that problems could be worked out. He referred to the strike at Young, where, he asserted, the union did not back up employees. According to Melva Polkinghorn and DuBois, Bohn also said that big shots in a union could be fired.

Later in the afternoon McMahon joined a group which included Bohn, Charles Gil-

* The Honorable Fred J. Nichol, Senior District Judge, District of South Dakota, sitting by des-     ignation.

more, the Polkinghorns, and an employee named Huey. When Huey complained that employees with less seniority than his were earning more than he and that certain work conditions were not right, Bohn responded that he was there to straighten things out. McMahon, who had been drinking, interjected that the only way to straighten things out was to get a union. Bohn asked if he was the one who was starting a union, and McMahon admitted that he was. The talk became loud and heated, with McMahon and Bohn swearing. According to McMahon, Charles Gilmore (a lead man)[1] declared that McMahon and Shady were nothing but troublemakers, and McMahon had only two weeks left.

A few months after the picnic, Bohn gave Melva Polkinghorn a raise, and told her to quit bad-mouthing the Company. The raise was not part of a plant-wide increase.

The ALJ found that questions at the picnic amounted to unlawful interrogation, and gave the employees the impression that their union activities were under surveillance. He further found that the "threat" to Melva Polkinghorn, to quit bad-mouthing the Company, could only refer to her union activities. Such an admonition, he concluded, interfered with Polkinghorn's protected rights under the Act. The Board adopted both findings of unlawful conduct, and ordered the Company to post an appropriate notice.

■ Five circumstances deserve consideration in unlawful interrogation cases:

a history of employer hostility and discrimination, the nature of the information sought (e. g., was the interrogator seeking information from which he could take action against individual employees), the identity of the questioner (i. e., what was his position in the company), the place and method of interrogation, and the truthfulness of the reply (e. g., did the interrogation inspire fear leading to evasive answers).

NLRB v. Ritchie Mfg. Co., 354 F.2d 90, 99 (8th Cir. 1965).

■ Applying these factors to the instant case, we think that no violation of the Act occurred at the picnic. The questioning about the union was isolated and casual, and took place in a recreational atmosphere. No one gave evasive answers, and this indicates lack of fear among the employees. Finally, other than the discharge of McMahon (discussed *infra*), there was no evidence of Company action against individual employees.

■ We find the evidence insufficient to support the conclusion that the Act was violated when Bohn told Polkinghorn to quit "bad-mouthing" the Company. This comment occurred three months after the only organizational meeting. Unlike the Board, we are not willing to assume that the comment referred to union activity.

### 2. The discharge of McMahon.

The Company maintains that McMahon was a problem employee, and the record supports this contention. At various times he failed to maintain a satisfactory level of production, and his attendance intermittently was poor. His foreman, Tom Gilmore, often had difficulty getting him to wear safety glasses, and when he persuaded McMahon to put them on there was no assurance that they would stay on. In mid-May, 1978 Gilmore discussed McMahon's work problems with the plant manager, Miller, but at that time Gilmore did not recommend discharge. In July Gilmore recommended discharge, but Miller disagreed, stating that they should make every effort to salvage McMahon as an employee.[2]

On the morning of September 26, 1978 an employee named Bickford heard McMahon say that he was going to kick the shit out of Rick Starr (another employee). Bickford repeated what he had heard to Charles Gilmore, who reported the matter to Bohn.

---

1. The ALJ found that Charles Gilmore was not a supervisor, and thus his conduct could not be attributed to the Company. Charles Gilmore's status is not an issue on appeal.

2. McMahon, who is illiterate, has a wife and four children to support.

Bohn warned Starr to stay away from McMahon, and then called McMahon to his office. He also had Tom Gilmore come. According to Bohn and Gilmore, they wanted to ask about the reported threat to Starr, and they had not made any decision to discharge or even discipline McMahon. However, in light of the fact that Gilmore may have been building a case against McMahon, the possibility of adverse action unquestionably existed.

According to Bohn and Gilmore, the first thing Bohn said was that he had heard that McMahon threatened Starr. McMahon vehemently denied this charge, and used considerable profanity. According to Gilmore, Bohn cursed back at him. McMahon asked to face his accusers, and Bohn refused. Finally, Bohn fired McMahon.

In contrast, McMahon testified that the first thing Bohn said to him in the interview was that he (Bohn) had said at the picnic that he would get rid of all troublemakers, and that four or five people would quit if he did not fire McMahon (thus indicating that Bohn had already made the decision to fire McMahon). Bohn then referred to the reported threat to Starr. McMahon then appealed to Gilmore and also asked that plant manager Miller be brought in to corroborate McMahon's assertion that he did not talk about people behind their backs, and that he was the sort of person who would confront someone face-to-face if he had something to say. McMahon denied cursing, but the ALJ discredited him on this point.

The ALJ found that the Company had ample ground to discharge McMahon, and that, therefore, the discharge did not violate the Act, even if McMahon's discharge was motivated in part by his union activities. He found that McMahon's poor work habits, low production, and refusal to wear safety glasses were legitimate reasons for the discharge. He found that it was unnecessary to decide whether Bohn had decided to fire McMahon before the interview.

The Board reversed the ALJ on the issue of the legality of the discharge. It found that the complaints of McMahon's poor work habits, low production, and refusal to wear safety glasses were too remote in time[3] to be the real reasons for his discharge. It further found that McMahon's loud and profane behavior at the meeting could not be a justification for the discharge, because this behavior was typical of him and cursing was common at the plant.

The existence of a good reason for discharge does not negate a violation of the Act if the discharge is actually for union activity, *NLRB v. Superior Sales, Inc.*, 366 F.2d 229, 233 (8th Cir. 1966). On the present state of the record, we are unable to determine what the actual reason for McMahon's discharge was. We think the Board erred in part in overturning the finding of the ALJ that poor performance and refusal to wear safety glasses were not part of the reason for McMahon's discharge. Complaints on these matters and Gilmore's recommendation of termination to plant manager Miller both occurred before McMahon was involved in organizing efforts. However, these faults of McMahon do not of themselves explain why the discharge occurred when it actually did and, indeed, the faults may not have been the precipitating cause of the discharge.

The timing of the discharge was suspicious, coming only a short time after the Company learned of McMahon's union activity. However, McMahon's profanity at the meeting, coupled with his previous shortcomings, could well explain the timing of his discharge. According to Bohn and Gilmore's version of the meeting, McMahon's behavior was very insubordinate and insulting.[4] We cannot agree with the Board that because the Company tolerated foul language from McMahon and others before that his profanity at the meeting

---

3. There were three written warnings on safety glasses, dated April 12, May 24, and July 12, 1978. There was a written warning dated August 9, 1978 concerning slow work.

4. Insubordination is an adequate reason for discharge. *NLRB v. Red Top, Inc.*, 455 F.2d 721, 728 (8th Cir. 1972).

was a pretext for discharge. Cursing at one's peers in a work situation differs from arguing profanely with one's supervisor in a meeting called to investigate reports of a threat.

The ALJ and the Board did not specifically determine whether Bohn made the decision to fire McMahon before the meeting or during the meeting. Rather, the Board noted that Bohn chose to confront McMahon only with the single issue of alleged threats and discharged him at the point when Bohn decided McMahon's loud and abusive protestations had become excessive. It then noted that other reasons mentioned in the post-discharge memorandum were not communicated to McMahon at the time of discharge, and from these facts drew the inference that the reasons were constructed as an afterthought to conceal an unlawful motive for the discharge.

This reasoning, however, in a way begs the question. It assumes without finding an answer to the question what happened at the meeting. If McMahon became so loud, profane and abusive at the meeting that discussion with him was impossible, then failure to mention all of the reasons for discharge would hardly support the inference that the reasons were pretextual and the discharge unlawful.

Resolution of the basic question requires in large measure a credibility determination: whether, as McMahon testified, Bohn's first words at the meeting indicated an intention to fire McMahon, or whether, as Bohn and Gilmore testified, no decision on disciplinary action had been made at the time the meeting started. Credibility questions initially are for the ALJ, not this court, and in present circumstances we cannot say that the Board's decision is supported by substantial evidence or by adequate reasoning. Accordingly, the Board is at liberty to conduct further proceedings looking toward a determination of what actually happened at the meeting of September 26, 1978 and the inferences to be drawn from the facts.

Enforcement is denied. The portion of the Board's decision relating to McMahon's discharge is remanded for such further proceedings as may be appropriate.